## SUPREME COURT.

ELIZABETH G. MERRIAM agt. ANSON F. WOLCOTT and others.

*Will — construction of — From what time does a will speak — When conditions in a will as to legatee's not marrying void — Conditions subsequent — Validity of marriage — Amendment — Costs.*

The testator on the 1st day of July, 1878, made and published his last will and testament, in which is contained the following provision:

"*Second.* I give and bequeath unto the persons hereinafter named as my executors the sum of twenty-five thousand dollars in trust; that they shall keep the same invested and pay over the interest, income and profit thereof to my daughter Elizabeth G. Merriam during her natural life. If, however, she shall marry a second time, then this bequest of such interest, income and profit to her, and the direction to pay over the same to her, shall cease and be void. Upon her death or marriage the said twenty-five thousand dollars shall go absolutely to her children by her present husband, Henry H. Merriam (if any be then living), share and share alike. If any of such children shall have died leaving descendants who are still living, then such descendants shall take the share which their respective parents would have taken had such parents survived. Such share of the principal sum of twenty-five thousand dollars shall not be paid over to the persons entitled to the same respectively, until he or she shall become thirty years of age. If after the death or marriage of the said Elizabeth as aforesaid, she shall leave no descendants by her present husband, then the said twenty-five thousand dollars shall go absolutely to my son, James E. Wolcott, or, if he be dead, then to his descendants." The plaintiff and her husband (Merriam) had separated in June, 1878, and in December, 1878, she went to Chicago, where she continued to reside till after the death of her father, which occurred in August, 1880. She applied for and obtained a divorce from her husband (Merriam) for desertion, with the knowledge and approval of her father. Before the death of the father, and on the same day her decree of divorce was entered, which was April 29, 1880, she was married to her present husband, Mr. McMullen:

*Held,* that this plaintiff is entitled to a judgment declaring that she is entitled to receive the interest, income and profit of the $25,000 from the time of the death of the said testator, and that the condition in said will, to the effect that her interest in or claim to said fund should cease in case of her marriage of a second husband, was and is absolutely void.

For some purposes a will is considered to speak from its date of execution, and for others from the death of the testator. The general rule is that a will speaks from the death of the testator and not from its

date, where there is nothing in its language indicating a contrary intention. When a testator refers to an actual existing state of things, the language is referential to the date of the will.

In respect to conditions subsequent, there must be a capacity and opportunity and an option on the part of the legatee to perform the conditions before a forfeiture of the legacy is or can be incurred. A court of equity, at all times reluctant to enforce a forfeiture or a penalty, will not do so when the victim of it has acted in ignorance of the con ditions upon which or with whose non-compliance such forfeiture was involved or dependent.

Where, as in this case, the testator knew that his daughter was separated from her husband, and he had abandoned her, and that she had removed to another state to gain a residence which would enable and qualify her to procure a divorce from such husband, he had paid for her support in such state, and defrayed the expenses of the suit to procure such divorce, and knew that she was entitled to marry again after such divorce, which he knew, before his death, had been granted:

*Held,* that to impose upon her the duty, under the bain of forfeiture of all interest in his estate, to remain unmarried for life, was harsh and cruel in the extreme, when such restriction was contained in a secret will unknown to her, and which she could not know till after his death. In such case the estate, to which the condition contained in such will was annexed, became absolute, to the same effect as if said condition had been fully complied with.

Where the marriage of the plaintiff with her present husband took place at 11 o'clock on the morning of April 29, 1880, and the decree of divorce was, in strictness and in fact, actually granted, entered and perfected at or about 2 o'clock in the afternoon of the same day:

*Held,* that plaintiff's marriage with Mr. McMullen was valid and binding upon the parties. It was made in good faith, both parties supposing and believing that she was actually divorced. The decree for that purpose would be considered as granted at the opening of the court on that day, as the court will not divide a day or examine critically the precise hour of the day in which any act in court is done; inquire into the fractions of a day, except in cases of necessity, for the purpose of guarding against injustice or where important rights are concerned.

Although the plaintiff had commenced this action in the name of her former husband (Merriam), the court has power to allow an amendment which shall substitute the name of the plaintiff in her present name of McMullen for her former name of Merriam upon the record, so that she may have judgment in her favor by her present name (McMullen).

The costs of all the parties should be paid out of the residuary funds in the hands of the executor.

*August,* 1881.

THIS action was commenced to obtain the construction, by. this court, of the will of the late George P. Wolcott.

The plaintiff was his daughter and was married to Henry H. Merriam in 1874, who left her and finally separated from her in June, 1878. While they lived together they lived with her father in Rochester, and she continued to live with her father after such separation till December, 1878, when she left this state and went west to Chicago, where she continued to reside till after the death of her father, which occurred in August, 1880.

While in Chicago, she applied for and obtained a divorce from her said husband for desertion, with the knowledge and approval of her father, who paid the expenses of the suit and also sent her the requisite money for her support while residing in Chicago. Wolcott, the testator, while the plaintiff was living with him, and on the first day of July, 1878, made and published his last will and testament, in which is contained the provision which presents the chief question in controversy in this action, and which is in the words following, to wit:

" *Second.* I give and bequeath unto the persons hereinafter named as my executors the sum of twenty-five thousand dollars in trust; that they shall keep the same invested and pay over the interest, income and profit thereof to my daughter Elizabeth G. Merriam during her natural life. If, however, she shall marry a second time, then this bequest of such interest, income and profit to her, and the direction to pay over the same to her shall cease and be void. Upon her death or marriage the said twenty five thousand dollars shall go absolutely to her children by her present husband, Henry H. Merriam (if any be then living), share and share alike. If any of such children shall have died leaving descendants who are still living, then such descendants shall take the share which their respective parents would have taken had such parent survived. Such share of the principal sum of twenty-five thousand dollars shall not be paid over to the persons entitled to the same respectively until he or she shall become thirty

years of age; if after the death or marriage of the said Eliza-
beth, as aforesaid, she shall leave no descendants by her present
husband, then the said twenty-five thousand dollars shall go
absolutely to my son, James E. Wolcott, or, if he be dead,
then to his descendants."

*Charles F. Baker,* for plaintiff.

*Oscar Craig,* guardian *ad litem,* and *James L. Angle,* for
defendants.

E. DARWIN SMITH, *Referee.*—In construing a will the first
inquiry that suggests itself will naturally be, at and from what
period its language speaks.

*Jarman on Wills* (*page* 298) says, upon this point, that
" For some purposes a will is considered to speak from its date
of execution, and for others from the death of the testator.
The former being the period of its inception, and the latter
that of the consummation of the instrument."

The rule is well stated by the supreme court of Connecti-
cut in two cases—*Canfield* agt. *Bostwick* (21 *Conn.*, 550), and
*Gold* agt. *Judson* (21 *Conn.*, 616), as follows: " The general
rule is that a will speaks from the death of the testator and
not from its date, where there is nothing in its language indi-
cating a contrary intention. When a testator refers to an
actual existing state of things, the language is referential to
the date of the will" (*Vide* 1 *Jarman,* 318; *Van Alstyne*
agt. *Van Alstyne,* 28 *N. Y.,* 377; *Van Vechten* agt. *Van
Vechten,* 8 *Paige,* 116; *McNaughton* agt. *McNaughton,* 41
*Barb.,* 50, *and Id.,* 34 *N. Y.,* 201).

So far as relates to the existing state of things when this
will was made, the testator must be considered as speaking
from its date, of his children, of the plaintiff and her two
children, of her then husband, and of the relations then exist-
ing between the plaintiff and her then husband. The plain-
tiff was then living with him with her two children, and her

Merriam agt. Wolcott.

husband had separated from and abandoned her, charging her with adultery, which imputation was known to the testator. All else spoken of or referred to in the will, so far as respects the plaintiff, relates to the future and speaks from the death of the testator. The plaintiff and her husband at the date of the will were then separated, and the testator doubtless supposed that such separation was final, and he probably contemplated that a divorce at the instance of one or the other would sooner or later confirm such separation. They were both young persons, having been married only about four years, and he doubtless considered that they would in future desire, one or both of them, to form other matrimonial connections, and in making said will he doubtless intended to interdict, so far as he was able to do so, his daughter from contracting a second marriage. His intention in this particular clearly must prevail, unless it is inconsistent with the rules of law. If she had been his wife he unquestionably might have any devise or bequest or legacy to her dependent upon the condition that she should remain his widow, and to determine upon her contracting a second marriage. She was his daughter, and he could have made any legacy or devise to her dependent upon her remaining unmarried if she had been under the age of twenty-one years, till she arrived at such age (*Stackpole* agt. *Beaumont*, 3 *Vesey*, 94); or without the consent or approval of other relatives, or of his executors under restrictions which are not unreasonable (2 *Jarman on Wills*, 42).

By the civil law from which the courts of equity in England derived many of their rules in respect to personal legacies, all conditions in wills restraining marriage, however qualified, were absolutely void. "Our courts," said an eminent English judge (lord ROSLYN) in the case of *Stackpole* agt. *Beaumont* (3 *Vesey*, 95), above cited, "in deciding questions that arose upon legacies out of lands, properly followed the rule that the common law prescribed;" but as to legacies relating to the personal estate it was otherwise. "It is impossible," he said, "to reconcile the authorities or range them under one

sensible, plain, general rule." These rules were derived from
the ecclesiastical courts, which follow largely the civil law."
But he held in that case that the law of England did allow
restraint upon marriage under the age of twenty-one years,
and said that, " confined to such cases where the restraint ope-
rated only up to the age which by the law and policy of the
country consent is necessary, he had no difficulty to say there
was no authority to lead the court to presume that such a con-
dition was invalid." This is as far as the lord chancellor would
go. In *Long* agt. *Dennis* (4 *Burr*, 2052), lord MANSFIELD
said: " Conditions in restraint of marriage are odious, and
are therefore held to the utmost rigor and strictness. They
are contrary to sound policy."

Judge STORY, in his *Equity Jurisprudence* (*sec.* 280),
thus summarizes the decisions of the English courts as fol-
lows : " The general result of the modern English doctrine
on this subject (for it will not be found easy to reconcile all
the cases) may be stated in the following summary manner :
'Conditions annexed to gifts, legacies, and devises in restraint
of marriage are not void, if they are reasonable in themselves
and do not directly or virtually operate as an undue restraint
upon the freedom of marriage. If the condition is in restraint
of marriage generally, then, indeed, as a condition against
the public policy and the due economy and morality of domes-
tic life, it will be void.' "

*Fonblanque on Equity* (*page* 198, *note* 9), says: " If the
condition be precedent and annexed to land, it must be strictly
performed in order to entitle the party to the benefit of the
gift. If the estate is personal, the force and validity of the
conditions must be reasonable. If the conditions be subse-
quent, its validity will depend on its being such as the law will
allow to divest an estate."

*Coke Lit.*, 206 *b.* (*Godolphin, also, as Story says, sec.* 283),
correctly laid down the general principle that all conditions
against marriage are unlawful, but if the condition is only
such as where marriage is not absolutely prohibited, but only

in part restrained as in respect to time and place and person, such conditions are not to be utterly rejected.

But judge Story, in section 287, also says that " one distinction is between cases where, in default of a compliance with the condition, there is a bequest over, and cases where there is no bequest over upon a like default of a party to comply with the condition." In the former case the bequest over becomes operative and defeats the prior legacy. In the latter, that is where there is no bequest over, the condition is treated as ineffectual.

Judge Story, in stating this distinction between the cases, does not modify the view of conditions in restraint of marriage, stated above in his summary of the result of the modern English cases, in section 280 above cited, or assent to the reasonableness of the distinctions suggested in this section 287. He merely stated the fact that such distinction is made in the cases, and the result or effect of the conditions in restraint of marriage when there is a bequest over. There is, it is true, such *dicta* or assumption, as he suggests, in many of the cases in the English reports, but there is not, I think, an express decision of the point where it was essential to and involved in the actual decision made.

The cases cited by judge Story, in respect to the distinction stated in this section 287, are *Clarke* agt. *Parker* (19 *Vesey*, 13), where the provision in the will provided in case the daughter of his sister-in-law, Sarah, should marry with the consent and approbation of his trustees, she should take the legacy in question. She married without such consent and the court held that she was not entitled to the legacy. The next case is *Wheeler* agt. *Bingham* (3 *Atkins*, 368). In that case the testator gave to each of his grand-daughters who should be living at the time of his decease, £1,500 on their respective days of marriage, and provided that if either of such grand-daughters married without the consent of her father and mother, or of the survivor of them, then he revoked what was directed to be paid her, &c. The plaintiff,

one of the said grand-daughters, married without the consent of her father and mother, and lost her legacy.

The next case is *Chauncey* agt. *Graydon* (2 *Atkins.*, 216). In that case the testator directed his trustees to transfer £1,000 of South Sea stock to each of seven children named, at the age of twenty-one years or day of marriage, they marrying with the consent of their father or his executor. Two of the children married without consent and it was held that they forfeited their claim to the legacy. Another case referred to is *Malcolm* agt. *O'Callaghan* (2 *Madd. R.*, 350). That was a case of a legacy made payable upon marriage with the consent and approbation of executors, with a limitation over upon marriage without consent. The condition was held in this case entirely legal. The other case is *Lloyd* agt. *Branton* (3 *Merivale*, 108), which was also a case where there was a marriage without consent with a bequest over, and the condition was held valid. *Roper on Legacies*, also, in a discussion of this question, makes the same distinction made by Story in section 287, and refers to the same class of cases on the subject (1 *Roper on Legacies, p.* 626).

In a note appended to his text, at page 795, this question is discussed and an extract inserted from an opinion of Mr. justice KENNEDY, of the supreme court of Pennsylvania, in the *Pennsylvania Law Journal*, 231, 235 (*Middleton* agt. *Rice*), where the judge says: "I apprehend in no case has it been held that if a legacy or bequest of personal property be given to a party either absolutely or expressly for life, with a condition subsequent annexed thereto if the legatee marries the legacy or bequest shall be given to a third party, such shall be good or available to the third person, because the condition being an absolute prohibition of marriage upon any terms whatever must be considered as wholly void and of no effect." And in *Jarman on Wills* (*vol.* 2, *p.* 38), in referring to the civil law and stating that by that law all conditions in restraint of marriage, whether precedent or subsequent, and however qualified, are absolutely void, it is said: "Our courts, however

Merriam agt. Wolcott.

(while they equally deny the validity to conditions in general restraint of marriage, though accompanied by a gift over), have not yet adopted the rule of the civil law in its unqualified extent, but have subjected it to various modifications," which he proceeds to state. On the question that the courts deny the validity of conditions in general restraint of marriage, though accompanied by a gift over, he refers to the following cases : *Morley* agt. *Rennaldson* (2 *Hare*, 570, 584). In that case the testator gave a legacy to his daughter Margaret with a gift over to others in case of her marriage. The condition was held void as imposing a general restraint upon the marriage of the legatee. " Here," said the vice-chancellor, " the testatator" (*p*. 584) " says his daughter ought not to marry and she shall not marry, and he gives the property after her marriage or death to other parties." Next he refers to *Loyd* agt. *Loyd* (2 *Simons* [*N. S.*], 255, 263). In that case the testator gave a bequest to his wife and another woman named Lockley, jointly for their lives, but if either married, the whole estate to go to the other. *Held*, that the condition was valid as to his widow but void as to Miss Lockley as a general restraint upon her marriage. And next, also, to *Bird* agt. *Hunsdon* ( 2 *Simons*, 342), where an annuity was left by a testator to the daughter of a friend to be paid to her as long as she remained single, with a bequest over in case of marriage. *Held*, an unreasonable restraint upon marriage and void.

In *Rishton* agt. *Cobb* (9 *Simms*, 615) the testator made a bequest to a widow lady not his wife, to receive the income as long as she remained single and unmarried. *Held*, that the condition was void as in restraint of marriage. And to the same effect is *Bellairs* agt. *Bellairs* (18 *Equity Cases, Law Report of* 1874), where a testator gave to his two daughters each ten shares of a certain stock, but if either daughter married then the share was to go to the other in the proportions stated. The conditions held void. The same rule was held in *Williams* agt. *Cowden* (13 *Missouri*, 212), where a testator

devised his estate to a son and daughter with the condition if the daughter married, the son was to have the whole estate. Condition held void.

In *Pool* agt. *Bott* (11 *Hare*, 33) a condition in a devise not to marry a certain person named, with a bequest over, was held void, and the court refused to enforce it. The bequest in this case to the plaintiff is an absolute bequest of a life estate or interest to her of the income and profit of $25,000.

It is not upon a condition precedent where as in case of an estate to accrue or arise from a marriage where the marriage must precede the right to the estate and the title to it. In such case the estate vests upon the performance of the condition, and not otherwise. Such was the case of *Harvey* agt. *Aston* (1 *Atkins*, 380), *Scott* agt. *Tyler* (2 *Brown's Ch. cases*, 431) and *Stackpole* agt. *Beaumont* (3 *Vesey*, 96). Also *Perrin* agt. *Lyon* (9 *East*, 93, *and vide Roper on Legacies*, 748).

There is a radical distinction between the vesting of an estate upon marriage and the divesting of an estate by or upon marriage. In the latter case the condition is subsequent and implies that the estate has vested. Such is this case. The estate in this case is first given to the plaintiff for life, and afterwards a bequest over is given to her children in case she shall marry a second husband, and upon that event the bequest of such interest, income and profit to her, and the direction to pay over the same to her, shall " cease and be void." That is, the estate first granted and vested shall cease (*Peyton* agt. *Bury, Peere Wms.*, 626). Such would clearly be the case here if the conditions which should destroy and avoid the preceding life estate and divest it were not absolutely void.

This will, in respect to all rights and interests in and to property speaks prospectively, and took effect from the death of the testator. At that point of time the estate vested in the trustees, and the life estate coeval with that event vested in the plaintiff. They began and coexisted from the same point of time. The marriage of the plaintiff before that time and in the life of the testator presents the chief difficulty in

the case.   If that. event had been known to the testator
before his death, and his assent to it could be presumed, that
would virtually annul the conditions in restraint of marriage
in the will within the cases *Wheeler* agt. *Warner* (1 *Simms
& Stuart* [*Eng. Ch.*], 304), *Smith* agt. *Cordey* (2 *S. & S. A.*,
354) and *Parnell* agt. *Lyon* (1 *Vesey & Beam*, 479), where the
marriage was forbidden without the consent of executors or
trustees.

The provision in restraint of marriage in this will must, I
think, so far as relates to the intention of the testator, relate
to the state and condition of the plaintiff and her relations to
her former husband existing at the time of making the will.
She was a then married woman and incapable of contracting a
second marriage until she was divorced from her former hus-
band or freed from her relation to him as his wife by his death.

Proof of a valid marriage after the making of the will must
have the same effect to divest the estate if made before, as it
would after the death of the testator, upon the same principle
that the marriage of the two daughters of Mr. Van Vechten
after the making of his will and in his lifetime did not divest
them of their marriage portions to be given them upon mar-
riage.   The chancellor held that the portions were due and
need not be paid in the lifetime of their father.   It was his
intent to give them the marriage portions, and, as he said, it
did not follow that these outfits which the daughters were to
receive as legatees in addition to their shares would only apply
to marriages which should take place after his death (*Van
Vechten* agt. *Van Vechten*, 8 *Paige*, 126).

The testator in this case clearly did not intend that his
daughter should marry a second husband so far as he could
restrict it.   If he had made such second marriage to depend
upon the consent or approval of his executors, I think it
would have been a valid restraint and the plaintiff could not
have received this legacy except and only as long as she com-
plied with such restrictions.   This view is subject, perhaps,
to the qualifications hereinafter stated.

*First exception.* — It is that she was one of his children and heirs-at-law, and independent of this will would have been entitled to the share of one-fourth in his estate as one of his heirs.

In *Porter* agt. *Fry* ( 1 *Ventries*, 199 ; *reported, also, in* 1 *Modern Reports*, 300, *and Thomas Raymond*, 236) a distinction is taken between persons who would have no title if there was no such instrument as that which contains the conditions and those who would have title without the instrument, and notice is considered necessary to subject the latter to the consequences of a breach of the conditions.

In that case there was a devise to A. K. in tail, upon condition that if she married without consent the estate should go over to the lessor of the plaintiff. She did marry without such consent, and the question was whether want of notice of the devise would save the forfeiture, and RAINFORD, justice, said : " I take a difference where the devisee who is to perform the condition is heir-at-law. The heir must have notice because he, having title by descent, need not take notice of any devise, unless it be signified to him." So in the case of *Wallow* agt. *Fitzgerald* (3 *Mod.*, 28, *and Skinner*, 125) where there was a conveyance by one Fitzgerald to himself with remainder to his daughter Catharine, and then intail with a proviso that if she married without consent the estate was to go over to another. She married without consent, but had no notice of the condition, and it was held in Ireland that Catharine should not lose the estate. The case was removed to the court of king's bench in England, and was twice argued there and the judgment unanimously affirmed — the court holding that Catharine's estate was not determined on the grounds of want of notice of the condition.

These, with other cases on the same point, are stated and reviewed in *Doe & Kenwick* agt. *Lord Beauclerk* (11 *East.*, 657), where, in or under a devise of a mansion and family estate to several persons successively for life, it was provided that whoever should be entitled to the estate should " take the

surname of Thelwell, and make the mansion his usual and common place of abode and residence, and in case of refusal so to do should forfeit the estate, and it should go over to others. The estate in due time came to Charlotte Carter, who assumed the name of Thelwell, but did not make the mansion-house her usual and common place of abode and residence. It was claimed that by reason of the conditional limitations of the estate to her it ceased, and the limitations over took effect. Judgment was given for the said Catharine in the court below, and in the king's bench this judgment was affirmed in a very elaborate opinion of lord ELLENBOROUGH upon the express ground that she never had notice of the conditions in the will. He said : " Where a party is really ignorant of the existence of the instrument in which the condition is contained, and where he would have good title if there was no such instrument, it seems unreasonable to hold that a neglect of the terms of the conditions should subject him to a loss of the estate.

The same point was decided the same way in *Sheckelford and Wife* agt. *Hall* (19 *Illinois*, 215). The testator had several children and devised his estate, real and personal, to his wife for her life and remainder to his children, and declared it to be his will that none of his children under the age of twenty-one years should marry till each one should attain the age of twenty-one, and directed that in case any one married under the age of twenty-one, then and in that event he, she, or they should only be entitled to receive the sum of one dollar out of the estate as his or her portion — Eliza, a daughter, married before she was twenty-one. The restriction of marriage till Eliza arrived at the age of twenty-one was held valid, but as she was heir-at-law of the testator, and as such entitled to share in his estate independent of the will, and had no notice of the conditions in the will in restraint of marriage, she should not forfeit her estate. The court say that they must assume that Eliza did not know of the existence of the will, and much less of the conditions it

contained that she should not marry till she was twenty-one years of age under the penalty of forfeiting her interest in her father's estate. In ignorance of the will she supposed she was entitled to take as heir without condition. The court held under the circumstances that "it would be a piece of monstrous injustice to enforce the forfeiture against her," and cites *Taylor* agt. *Crisp* (35 *Eng. Com. L. R.*, 522), upon the same point and the above case of *Kenwick* agt. *Beauclerk* (11 *East.*, 657), and other cases.

The case of *Taylor* agt. *Crisp* is also in 8 *Adol. & Ellis*, 788. This case relates of legacies out of real estate, but there is, as the lord chancellor said in *Stackpole* agt. *Beaumont* (3 *Vesey*, 95), no ground in the construction of legacies for a distinction between legacies out of personal and out of real estate. The construction ought to be precisely the same.

*Secondly.* 1 *Roper on Legacies* (*page* 782), says that conditions subsequent are construed with great strictness, and it is a consequence from this rule that if the subsequent conditions cannot be performed from being impossible or illegal, the condition is *void* and the legacy single and absolute.

It was contemplated in this case that the plaintiff should not marry after the death of the testator, and after she knew what condition he had imposed in his will against such second marriage. Her marriage before his death rendered compliance with this condition impossible.

It is like the case stated in *Roper* (*p.* 802), when the conditions are that the legatee should not marry without the consent of two or more trustees or executors, and the death of one of such executors or trustees rendered it impossible to procure such consent. In such case he says: "It being impossible to perform the conditions literally, the legatee will be excused from performing altogether."

The following cases affirm this rule: *Peyton* agt. *Bury* (2 *Peere Williams*, 626); *Jones* agt. *Suffolk* (1 *Brown's C. C.*, 528); *Knight* agt. *Cameron* (14 *Vesey*, 389); *Graydon* agt. *Hicks* (2 *Atkins*, 16, 18); *Aislabie* agt. *Rice* (3 *Mad-*

*dock's C. R.*, 256); *Grant* agt. *Dyer* (2 *Dow*, 87); *Story's Eq. J.*, sec. 1304; *Parker's Cases*, 73; 2 *Redfield on Wills*, 664.

All these cases imply that in respect to conditions subsequent there must be a capacity and opportunity and an option on the part of the legatee to perform the conditions before a forfeiture of the legacy is or can be incurred. A court of equity, at all times reluctant to enforce a forfeiture or a penalty, will not do so when the victim of it has acted in ignorance of the conditions upon which or with whose non-compliance such forfeiture was involved or dependent. No case can illustrate the injustice of a contrary rule more than this. The testator knew that his daughter was separated from her husband and he had abandoned her. He knew also that she had removed to another state to gain a residence which would enable and qualify her to procure a divorce from such husband. He paid for her support in such state and defrayed the expenses of the suit to procure such divorce, and knew that she was enabled to marry again after such divorce, which he knew, before his death, had been granted. To impose upon her the duty under pain of forfeiture of all interest in his estate to remain unmarried for life was harsh and cruel in the extreme, when such restriction was contained in a secret will unknown to her and which she could not know till after his death, when possibly it might be too late to save any interest in his estate.

At the death of the testator it was impossible for the plaintiff to comply with the conditions of the will requiring her to refrain from having a second husband. She already had a second husband. Such second husband had acquired that relation to her in due form of law, by ceremonial marriage, made in good faith after she had been, or supposed she had been, lawfully divorced from her former husband. In such case the estate to which the condition contained in said will was annexed became absolute (2 *Jarman*, 10), to the same effect as if said condition had been fully complied with.

This brings me to the consideration of the questions con-

nected with the marriage of the plaintiff to her present hus-
band. Such marriage confessedly took place between the
hours of 10:30 and 11 o'clock on the morning of April 29,
1880. On the same day her decree of divorce was entered.

The trial to establish by proof her rights to such divorce
was had on the twenty-fourth of the same month in open
court before the judge presiding, who then announced that
such proofs were sufficient to entitle her to such divorce and
directed her attorney to have such testimony duly transcribed
and a decree of divorce prepared.

It is the practice in the court in which this divorce was
obtained, as I understand it, to have the testimony taken on
the trial, and upon which the decree of divorce was founded,
transcribed by the stenographer and presented to the judge
for his correction and approval, and filed with the decree.
This was done in this instance, and the final decree with this
proof was filed, and such decree entered by the clerk under
the direction of said judge on the twenty-ninth day of April.
What took place in the meantime between the taking of the
proofs and the time of the filing and entry of such decree, I
think quite non-essential. The final decree speaks for itself.
It is entered on the 29th day of April, 1880.

This decree and the transcript of the testimony with the
fiat of the judge indorsed thereon, from the testimony of the
judge and of the clerk, and from the course of business in
said court, I should think was filed at the afternoon session of
said court, commencing at two o'clock on the said twenty-
ninth day of April. The testimony and draft decree were
handed to the judge in court.

The judge testified that a transcript of the testimony was
presented to him on or before the twenty-ninth of April,
and after having been examined by him to see if they cor-
responded with his recollections of the testimony; they were
indorsed by him, or rather signed by him as being a certificate
of all the evidence in the case, signed by him in his official
character. The pains taken by this judge to read this evidence

and certify it, obviously suggests that some time was taken to do this. Perhaps it was done in some interval of business or at the recess at noon, and tends to confirm the belief of the clerk that these papers were filed in the afternoon session of the court. I think this a natural inference from the facts in connection with the other testimony on the subject, for no one could recollect time with exactness. I think I am forced so to find upon the evidence.

It follows from this view of the evidence that the decree of divorce was in strictness and in fact actually granted, entered and perfected at or about two o'clock in the afternoon of the twenty-ninth day of April. 'But I am inclined to think, nevertheless, that plaintiff's marriage with Mr. McMullen was valid and binding upon the parties. It was made in good faith, both parties supposing and believing that she was actually divorced. The decree for that purpose would be considered as granted at the opening of the court on that day, as the court will not divide a day or examine critically the precise hour of the day in which any act in court is done; inquire into the fractions of a day except in cases of necessity for the purpose of guarding against injustice, or where important rights are concerned (*Blydenburg* agt. *Cotheal*, 4 *Coms.*, 418; *Clute* agt. *Clute*, 3 *Denio*, 263).

The courts of this state uniformly amend the record if need be, and direct their judgments to be entered as of the first day of the term (*Manchester* agt. *Harrington*, 10 *N. Y.*, 169), or of the time when the act or judgment was actually due, as upon the rendition of a verdict or the direction for an interlocutory decree, or the time of the submission of a case to the court for its decision, and in furtherance of justice and to protect the rights of parties, direct such judgment to be entered and record amended *nunc pro tunc* to that end.

In this case I have no doubt that the circuit court in Illinois, in which this decree of divorce was granted, on due application for that purpose, would amend this record and direct the judgment or the decree of divorce to be entered

*nunc pro tunc* as of the 24th day of April, 1880, when it was virtually granted and was, in fact, really due. And as the said marriage was in fact consummated by immediate and continued cohabitation of these parties as husband and wife, the courts of all the states in this country, I think, would in aid of such marriage, and to sustain its validity, presume a further or subsequent marriage of said parties if need be, and would not allow either of said parties to disown such marriage to establish that they had, since it was solemnized in form, lived in a known and avowed state of prostitution and adultery, within the case of *Collins* agt. *Collins* (80 *N. Y.*, 9).

These views lead to the decision that this plaintiff is entitled to a judgment declaring that she is entitled to receive the interest, income and profit of the $25,000 from the time of the death of the said testator, and that the condition in said will to the effect that her interest in or claim to said fund should cease in case of her marriage of a second husband was and is absolutely void.

Another question exists in the case. It is whether the plaintiff having commenced this action in the name of her former husband (Merriam), can have judgment in her favor by her present name (McMullen). The case, it seems to me, is like that of the *Bank of Havana* agt. *McGee* (20 *N. Y.*, 361). In that case the action was in the name of the Bank of Havana, that being the name of a private bank owned by Charles Cook, of Havana. The action had been tried upon its merits and the objection to the name disregarded till it reached the court of appeals, where it was held to have been improperly brought in the name of the bank, as it was not a corporation.

The court held that this was merely a formal error amendable in the court of original jurisdiction, and to be disregarded in that court, and was a plain case for amendment under section 173 of the Code as it then stood. The present Code has retained the same section amended, by inserting the words " on the trial or at any other stage of the action " (*sec.* 723),

and section 1018 of the new Code gives to referees the same powers as the court in respect to amendments at the trial, to "allow amendments to the summons and to the pleadings," &c. The referee, under section 723, may conform the pleadings to the facts proved. I have some doubts upon the point whether the referee in this case can allow an amendment which shall substitute the name of the plaintiff in her present name of McMullen, for her former name of Merriam upon the record, and changing the summons and conforming the pleadings to the proofs ; but as the power is clearly possessed by the court, I think it expedient to make such provision in the judgment to be rendered, as the court can clearly confirm such order or direction, and the judgment directed by me, I think, should be presented to the court for confirmation.

The next question is what direction shall be given in respect to the costs in this action. I have no doubt on this question. I think the costs of all the parties should be paid out of the residuary funds in the hands of the executors.

The plaintiff was obliged to come into court to get its decision in respect to her rights. The executors were justified in opposing her claim so far as to obtain the decision of the court in respect to the conflicting claims of the plaintiff and her children to said legacy, and for their own guidance, direction and protection.

The case I have regarded as one of great doubt and difficulty, and the decision to which I have come is the result of much research, study and reflection.

All parties should be paid their costs out of the residuary estate (*King* agt. *Strong*, 9 *Paige*, 100 ; *Rogers and others* agt. *Ross*, 4 *Johns. Ch.*, 608).

NOTE.— It is not our custom to publish the opinions of referees, but we think the foregoing is worthy of being made an exception. It will be remembered that the referee writing the same has occupied the supreme court bench for years, and has always stood among the first jurists of the state. The opinion is an important and well considered one, and will doubtless be cited with approval by our higher courts. — [ED.