TURPIN *vs.* THE PUBLIC ADMINISTRATOR.

*In the matter of the Estate of* HENRY TURPIN, *deceased.*

ACCORDING to the canon law, a promise of marriage, *per verbâ de futuro*, i. e.
to become husband and wife at some future time, if the promise was
followed by consummation, constituted a valid marriage. Whether that
is the rule of law existing in this State,—*Quære?*

Where no promise of any kind was proved, except that the claimant de-
clared after the decedent's death, that she was not married to him, but
he had said that he had some trouble on his mind, and when that was
settled would marry her; and where the parties, though having connec-
tion and children, did not live together, but their relation was clandes-
tine, and there was no open acknowledgment or common reputation,
and both parties denied marriage,—*Held*, that there was not sufficient
in the circumstances, from which to infer a marriage.

When parties are living in a meretricious state, a promise to marry on a
future condition, does not effect a marriage by a mere continuation of
that connection.

ALANSON NASH, *for Claimant.*
H. H. ANDERSON, *for Public Administrator.*

THE SURROGATE. There are in this case, two applica-
tions for administration; one by the Public Administrator,
and the other by a party claiming to be the widow of the
deceased. There is no proof of a formal or ceremonial
marriage, nor a pretence of any. Nor did the parties
cohabit with each other. The decedent resided at his
boarding-house; and the claimant lived separately, keeping
a small store from which she generally derived means of
support. Turpin passed among his friends as an unmar-
ried man. The claimant ordinarily went by the name of
a deceased husband, Morrison. Turpin generally spent his

evenings at her room, had connection with her for several years, and was the father of one, if not of two, of her children. She washed for him; he gave her money and clothes occasionally; he took her out several times, but brought no friends to the house, and did not publicly recognise her as his wife. The connection was in fact clandestine. It is proved that after his decease, she explicitly declared she had not been married to him.

On the other hand, it appears that the youngest child was baptized in his name, and the same evening he sat down with the family to a supper on the occasion, in the course of which, as testified to by one witness, he once addressed her as Mrs. Turpin.

This is about the substance of all the important facts in the case, and the question is whether they afford sufficient ground for presuming or inferring a marriage in fact.

After Mr. Turpin's death, the claimant stated to his landlady, that she was not married to him, but said, he had stated that "He had a little trouble on his mind, and when that was settled he would marry me, and no woman should stand before me." The counsel for the claimant insists that this statement brings the case within the rule adopted by the canonists, that " a promise *per verbâ de futuro*, which was an agreement to become husband and wife at some future time, if the promise was *followed* by consummation constituted marriage, without the intervention of a priest." (*Poynter on Marriage and Divorce, p.* 13.)

It is somewhat curious in this connection to observe that our statute declares that, "any man who shall, under promise of marriage, seduce and have illicit connection with any unmarried female of previous chaste character, shall be guilty of a misdemeanor," &c. (*Laws of* 1848, *Ch.* 111.) This language is sufficiently general to cover the case of a promise to marry *in futuro*, followed by consummation, which, as seen, according to the canon law constitutes a perfect marriage; so that under such a construction of the

act, a man would be punished for marrying. It is true, there may be connection not in performance of the promise, the promise being still treated as executory. (*Queen* vs. *Millis*, 10 *Cl. & F.* 782, 905); and if the act of the Legislature is to be considered as referring only to that class of cases, it may not be in derogation of the rule of the canon law. Without examining that question more minutely, and treating this case on the hypothesis that a promise to marry *per verbâ de futuro, cum copulâ,* constitutes a perfect marriage, I do not find sufficient in the evidence to sanction the conclusion that there was between the decedent and the claimant, a marriage of that character. No promise of any kind is proved, except that the claimant declared after the decedent's death, that she was not married to him, but that he said, "he had a little trouble on his mind, and when that was settled, he would marry her." It does not appear when this statement was made, whether before or after the commencement of their connection; and when parties are living in a meretricious state, a promise to marry on some future condition, does not effect a marriage by a mere continuation of that connection. Besides, all that is known on this point is from the declaration of the claimant made after the decedent's death, and in conjunction with a denial of marriage. There was no cohabitation or *consortium vitæ*— no public living together—no general and open acknowledgement, or common reputation. The connection was as clandestine as under the circumstances it could be. Both parties denied that there was a marriage; and even on the supposition that the claimant in making this denial referred to a ceremonial marriage, there is not enough in the circumstances proved before me, to infer that there was such an agreement as in law constituted the parties man and wife. I must therefore pronounce against the claimant.