# WILLIAM F. CARTWRIGHT *et al.*

### *v.*

## ABEL A. McGOWN.

*Filed at Springfield June 17, 1887.*

1. MARRIAGE—*of the elements of a valid marriage—at common law, and under the statute.* Marriage being a civil contract, by which a man and woman agree to take each other for husband and wife during their joint lives, unless it is annulled according to law, and to discharge toward each other the duties growing out of the relation assumed, may be entered into without any license from the State, in the absence of a statute making it essential, by declaring a marriage without it void. The only essentials at common law are, that the parties must be capable of assenting, and that they must, in fact, consent, to assume the new relation.

2. Where the consent to marry is manifested by words *de presenti*, a present assumption of the marriage *status* is necessary; but it is not essential that there shall be any other formality, apart from the agreement itself, nor that it shall be made before witnesses. The consent must not be attended by an agreement that some intervening thing shall be done, or that the contract shall be publicly solemnized.

3. While the statute prescribes certain formalities to be observed in marriages, and certain steps to be taken to preserve the evidence of the same, it does not declare a marriage void which is legal by the common law, merely because not entered into in accordance with its provisions.

4. But a simple marriage ceremony will not necessarily constitute a valid marriage. Capacity and consent are absolutely essential, while celebration is only contingently so. Sexual intercourse, which the parties know to be contrary to law, can not form even an element of marriage.

5. SAME—*presumptions in support of an assumed marriage.* Where the celebration of a marriage is once shown, the contract of marriage, the capacity of the parties, and in fact everything essential to its validity, will be presumed, until the contrary is shown.

6. The presumption, however, of the capacity of a man to marry at a given time, may be overcome by proof of his prior marriage, and that his wife by that marriage was then living and undivorced.

7. In many cases the presumption in favor of innocence, and against immorality and guilt, is so strong as to give rise to the presumption of a marriage; but no such presumption will arise if it will involve one of the parties in guilt,—as, when a man is cohabiting with two women, or when one of the parties has been proven to be married to some one else.

8. SAME—*cohabitation and repute—as bearing upon the question of the existence of the marriage relation.* Where parties competent to marry have agreed to marry at some future time, and they afterward have *copula,* lawful only in the married state, in the absence of any evidence to the contrary they will be presumed to have taken each other for husband and wife, and changed their future promise to marry to one of present marriage. In such case, the *copula* will be presumed to have followed the then present assumption of the marriage relation, and to have been the result of the consummation of the actual marriage.

9. This kind of a common law marriage is to be distinguished from cases of seduction, or sexual intercourse followed by a promise of marriage, or cases where the intercourse is illicit in its inception, and known to be such. It is not sufficient to agree to present cohabitation, and a future regular marriage when more convenient, or when a wife dies, or when a ceremony can be performed.

10. While cohabitation and repute do not constitute a marriage, they are evidence tending to raise a presumption of marriage, of more or less strength, according to the circumstances of the case. The cohabitation must be matrimonial, and not meretricious, in order to give rise to such presumption.

11. Where a marriage in fact is not shown, either by record evidence or by witnesses present at its celebration, the long continued cohabitation of the parties, their reputation of being man and wife, and their recognition as such in society, will afford evidence of their marriage in some legal mode, unless it is shown that their cohabitation commenced illegally. Marriage may be shown by circumstantial evidence.

12. The presumption in favor of marriage from evidence of cohabitation, is rebutted and overcome by proof of its being meretricious in its inception. When shown to have been illicit in its origin, it will be presumed, in the absence of anything showing otherwise, that its continuance was of the same character, and illegal.

13. And so cohabitation and common reputation of a marriage, if shown to have grown out of or to have had its origin in an assumed but void marriage, will afford no evidence of a lawful marriage. No marriage can be presumed from illicit sexual intercourse.

14. Where a marriage ceremony is shown to have been performed between a man then having a living undivorced wife, and another woman, there being nothing to indicate to their neighbors and friends that the same was void for any cause, the repute of his marriage will be presumed to have resulted from the marriage shown to have been thus celebrated, and will not afford evidence of any other marriage than the illegal one.

15. Where cohabitation is commenced under a marriage which is void by means of an impediment to its lawful consummation, the removal of the impediment alone will not change it from being meretricious, and render it matrimonial. But the parties may, by consenting to and assuming the marriage relation, effect such a change.

16. Where the proof fails to show that either of the parties had any knowledge of the removal of the impediment to their lawful marriage, it will not be presumed, in the absence of evidence to that effect, that they have changed their relations to each other, and assumed the *status* of marriage.

17. A man was lawfully married in 1841, in the State of Kentucky, and abandoned his wife in about a year after. He came to this State, where he was married to another woman in 1843, his former wife still being alive and undivorced. In 1846 his first wife obtained a divorce. He continued to live with his second wife up to his death, in 1868, during all which time he treated her as his wife. The proof showed that the second wife had no knowledge of the prior marriage until after his death, and failed to show that he ever had any notice of the divorce, and no subsequent marriage with his second wife was shown: *Held,* that such a marriage after the divorce could not be presumed, under the circumstances.

18. SAME — *presumption of divorce, in favor of a second marriage.* Courts, in favor of a second marriage, will sometimes presume the death of a prior husband or wife when not heard from for a much less period than seven years, and for the same reason they will often presume a previous divorce when there is shown to be reasonable time and opportunity to procure one.

19. Where the proof showed that a man was married in 1841, in the State of Kentucky, that he abandoned his wife in about a year after, and came to this State, where he was again married to another woman in 1843, and that the first wife procured a divorce in 1846, and was living after his death, in 1868, it was *held,* there could be no presumption that he had obtained a divorce prior to his second marriage.

20. SAME — *mistake of name in license.* A marriage in fact, between parties having the legal right to marry, will not be invalidated by a mistake in the spelling of one of their names, as, where the name of the woman was *Zerelday* Cacey, but was spelled in the license "Seralda," and in the minister's certificate, "Serelda." Every reasonable and fair presumption will be indulged for the purpose of upholding and sustaining a marriage and establishing the legitimacy of the offspring.

21. SAME — *marriage void if entered into during existence of prior one.* Until a prior valid marriage is terminated by the death of one of the parties, or otherwise, the parties thereto are absolutely incapable, in law, of entering into a second marriage; and if a second one is solemnized, it will be null and void, without any decree so declaring it. Its invalidity may be shown in any court, either in the lifetime of the parties or after their death, in any case where it may be drawn in question.

22. LIMITATION — *laches in filing bill for partition.* A party seeking the partition of land, in equity, will not be denied relief on account of *laches,* when he would not be barred from his action for his interest in the land in a suit at law.

23. SAME—*under the law of 1839.* A defendant to a bill for partition, not having any color of title, can not invoke the limitation law of 1839. To establish a bar under that law, the defendant's possession and payment of taxes for seven successive years must be under color of title.

WRIT OF ERROR to the Circuit Court of Montgomery county; the Hon. JESSE J. PHILLIPS, Judge, presiding.

This was a bill filed by William F. Cartwright and others, the brothers, sisters and mother of Braxton B. Lewis, deceased, and the heirs of his deceased brothers and sisters, for the partition of certain lands of which the said Lewis died seized. The bill is framed on the theory that the deceased left no lawful issue capable of taking from him by inheritance.

It appears that Lewis was, on April 29, 1841, lawfully married to one Sarah James, in Caldwell county, in the State of Kentucky; that he lived with her there for about one year, when he abandoned her, left Kentucky and came to this State, where he resided up to the time of his death, which was on January 10, 1868. One child was born of this marriage, which died in infancy. On February 26, 1845, the said Sarah filed her bill, in the circuit court of Caldwell county, against the said Braxton B. Lewis, for a divorce, charging desertion for over three years, and defendant's marriage in Illinois, which resulted in a decree of divorce on December 12, 1846. It appears from the records of the county clerk's office in Montgomery county, in this State, given in evidence, that on December 8, 1843, said Lewis was formally married to one Zerelday Cacey, under a license issued out of said clerk's office, the ceremony having been performed by one J. W. Woods, a minister of the gospel, who certified to the fact of the marriage. In the license Miss Cacey's name was written "Seralda" Cacey, and in the minister's certificate "Serelda" Cacey. Lewis lived with Zerelday, as his wife, up to the time of his death, and always recognized and treated her as his lawful wife. They had four children born unto them, which Lewis always recognized as his own. Three of these children

died in their early infancy, and prior to his death. Only one of them, Mary A., survived him. She was born October 31, 1851, and was married to Abel A. McGown February 20, 1868. On January 9, 1870, she gave birth to a son, Oliver F. McGown. She died July 10, 1870, leaving this son as her only heir-at-law. He died July 10, 1870, leaving his father, Abel A. McGown, his only heir. Zerelday Lewis died intestate February 4, 1885.

The bill made Abel A. McGown a party defendant, charging that he claimed some interest in the premises. He answered the bill, and set up the marriage of Lewis with Zerelday Cacey, in Montgomery county, in this State, without stating when it was celebrated; charged the making of valuable improvements by him upon the lands, and the payment of all taxes for more than seven successive years, with possession, and setting up the Statute of Limitations and *laches* as a bar to the relief sought. On the hearing, upon the pleadings and proofs, the bill was dismissed, and the complainants below prosecute this writ of error.

Mr. A. N. Kingsbury, and Messrs. Lane & Cooper, for the plaintiffs in error:

The marriage in 1843 being void by reason of the existence of a prior valid marriage, was Lewis ever afterward married to the second wife? A pretended common law marriage is set up, but no time, place or circumstances under which it was made is given, or whether any person was present or not.

A marriage entered into by parties having another husband or wife living, does not become lawful by a removal of the impediment.

The reputation relied on to prove a second marriage in this State could never have existed, and could not have been proved, but for the record evidence of their marriage. But for the prior marriage, the reputation might have afforded evidence in this case.

When Lewis and Miss Cacey were married, he was under disability, and there was no contract. She supposed she was lawfully married, and so thought until after Lewis' death, and hence there was no new contract, as she supposed there was no necessity for it.

Cohabitation, though evidence of marriage, can not make a valid marriage. (*Carter* v. *State,* 44 Ala. 29.) Living together as man and wife is not marriage, nor is an agreement to so live. *Litlers* v. *Cady,* 10 Cal. 533; *Hensley* v. *Morgan,* 47 id. 723.

Where the relations had their origin in illicit intercourse, no presumptions arise, and to show it was not continuous requires proof of actual marriage. (*Clark* v. *Cassidy,* 64 Ga. 663.) Nor does it matter that the innocent party to the second marriage was ignorant of the first marriage. *Clark* v. *Cassidy,* 62 Ga. 412.

When the connection is illicit in its origin, and continues, it is incumbent on those setting up a second marriage to show where and when it occurred. *Barnum* v. *Barnum,* 42 Md. 297; *Jones* v. *Jones,* 48 id. 391. See, also, *Dickerson* v. *Brown,* 49 Miss. 373; *Randh* v. *Pegram,* id. 756; *Floyd* v. *Calvert,* 53 id. 37; *O'Gora* v. *Eisenlohn,* 38 N. Y. 296; *Carlyle* v. *Wood,* 63 Mo. 514.

Cohabitation on a promise of marriage can not constitute a marriage, even when continued after obstacle to is removed. *Foster* v. *Hawley,* 8 Hun, 71; *Duncan* v. *Duncan,* 10 Ohio St. 181; *State* v. *Whaley,* 10 S. C. 503; *Williams* v. *Williams,* 46 Wis. 464.

Persons having a husband or wife living are not competent to contract marriage, and no presumption of marriage can be indulged from the cohabitation of such parties. *Hebblethwaite* v. *Hepworth,* 98 Ill. 126; *Stoltz* v. *Doering,* 112 id. 234.

Mr. JAMES M. TRUITT, for the defendant in error:

The presumption of marriage arising from cohabitation, is one of the strongest presumptions known to the law. See

1 Bishop on Marriage and Divorce, sec. 457, note 3; *Strode* v. *Magowan*, 2 Bish. 627; Lawson on Presumptive Evidence, 104-107; *Hynes* v. *McDermott*, 91 N. Y. 451; *Morris* v. *Davis*, 5 Cl. & Fin. 163; *Piers* v. *Piers*, 2 H. L. Cas. 321.

Plaintiff in error undertook to prove a statutory marriage, and for that purpose offered a marriage license for the marriage of Lewis with Serelda Cacey, certified to by James Wood, who is not shown to have been qualified to perform the ceremony, that the parties were married by him. This evidence is insufficient, first, because the names of the parties are different,—"Serelda" certainly not being Zerelday; and second, the identity of the parties is not shown. 2 Greenleaf on Evidence, sec. 461; 3 Phillips on Evidence, sec. 3, p. 436; *Wedgewood's case*, 8 Greenlf. 75; *Commonwealth* v. *Norcross*, 9 Miss. 492; *Birt* v. *Barlow*, 1 Doug. 171; *Harmon* v. *Harmon*, 16 Ill. 85.

In *State* v. *Hodgskins*, 19 Me. 155, it was held necessary to prove that the person who performed the ceremony had authority to do so, which was not done here.

If the contract of marriage was made *per verba de presenti*, as allowed by the common law, it is sufficient. *Post* v. *Post*, 70 Ill. 484; *Hebblethwaite* v. *Hepworth*, 98 id. 126.

If, by the law of the place where the parties dwell, a mere present mutual consent constitutes a valid marriage, then, if they are living together in a connection which both desire should be matrimonial, but an impediment renders the marriage void, valid marriage will instantly arise on the removal of the impediment, while the mutual wish for marriage continues; and it is immaterial whether the impediment was known to the parties or not. Bishop on Marriage and Divorce, (6th ed.) sec. 505; Schouler on Dom. Relations, 43; *Fenton* v. *Reed*, 4 Johns. 52; *Rose* v. *Clark*, 8 Paige, 573; *Donnelly* v. *Donnelly*, 8 B. Mon. 113; *Blanchard* v. *Lambert*, 43 Iowa, 228; *Collins* v. *Collins*, 80 N. Y. 1; *Physick's Estate*, 2 Brewst. 179; *State* v. *Worthington*, 23 Minn. 528; *DeThorn*

v. *Attorney General,* 1 App. Cas. 686; *Breadalbane's case,* Law Rep. (2 H. L.) 269.

As to the presumption of a marriage between Lewis and Zerelday Cacey, see *Blanchard* v. *Lambert,* 42 Iowa, 228, and *Donnelly* v. *Donnelly,* 8 B. Mon. 113.

Counsel argued various other points, and considered the cases cited by the plaintiff in error, and discussed the evidence at some length.

Mr. JUSTICE SHOPE delivered the opinion of the Court:

The right to have partition of the lands described in the bill, depends upon the fact whether Braxton B. Lewis, at his death, left any lawful issue capable of taking from him by inheritance. He left one child, Mary A., his other children having died while mere infants. It is not denied by the plaintiffs in error that he was formally married to one Zerelday Cacey, mother of this child, December 8, 1843, in Montgomery county, in this State, under a license issued out of the office of the clerk of the county court of that county, nor that he afterwards lived and cohabited with her, as man and wife, up to his death, and recognized the issue of such cohabitation as his children; but it is claimed that this marriage was absolutely null and void, for the reason that Lewis had, at the time of its solemnization, a lawful wife then living in Caldwell county, in the State of Kentucky, from whom there was no divorce.

The marriage of a man and woman, where one of them has a husband or wife by a prior marriage, who is then living and undivorced, is void, and not merely voidable. Being a nullity, no decree is necessary to avoid the same. *Reeves* v. *Reeves,* 54 Ill. 332; *Drummond* v. *Irish,* 52 Iowa, 41; *Blossom* v. *Barrett,* 37 N. Y. 434; *James* v. *James,* 5 Blackf. 141; *Teft* v. *Teft,* 35 Ind. 44; *Glass* v. *Glass,* 114 Mass. 563; *Martin* v. *Martin,* 22 Ala. 86.

A void marriage is good for no legal purpose, and its invalidity may be shown in any court, between any parties, either in the lifetime of the parties thereto, or after their death.   There can be no doubt of the fact of the prior marriage of Lewis to Sarah James, in Caldwell county, Kentucky, and that he abandoned her in less than a year after their marriage, and came, shortly after, to Montgomery county, in this State, and that such prior wife obtained a divorce from him in the circuit court of Caldwell county, Kentucky, in December, 1846, some three years after his second marriage. The first marriage is satisfactorily shown by the record evidence thereof, and the testimony of many witnesses who were present at its celebration and knew the parties.

Defendant in error contends that the evidence does not sufficiently show that the marriage with Zerelday was in 1843, or at any time prior to the divorce in Kentucky, but that the facts and circumstances are such as to afford presumptive evidence of a common law marriage after the divorce.   The marriage certificate on file in the proper office, shows that this marriage was celebrated on December 8, 1843, by one J. W. Woods, a minister of the gospel.   The proof also shows that Woods was a minister of the gospel, and that Lewis cohabited with this woman, as his wife, up to his death, and that she was always reputed to be his wife.   No importance is attached to the fact that the woman's name in the marriage license was written "Seralda," and in the minister's return thereon "Serelda."   The evidence shows, beyond dispute, that Zerelday Cacey was the person named in the certificate of marriage and the license.   If this was the only marriage of Lewis, there could be no doubt of the sufficiency of the evidence to establish the same.   It could not be invalidated by any mistake in the spelling of a name.   Every reasonable and fair presumption will be indulged for the purpose of upholding a marriage, and establishing the legitimacy of the offspring.   When the celebration of a marriage is once shown,

the contract of marriage, the capacity of the parties, and, in fact, everything necessary to the validity of the marriage, in the absence of proof to the contrary, will be presumed. *Caujolle* v. *Ferrie,* 26 Barb. 177; *Fleming* v. *People,* 27 N. Y. 329; *Strode* v. *Magowan,* 2 Bush, 627; 1 Bishop on Marriage and Divorce, sec. 457; Lawson on Presumptive Evidence, 104-107; *People* v. *Calder,* 30 Mich. 85; *State* v. *Kean,* 10 N. H. 347.

The presumption of the capacity of Lewis to enter into the marriage contract with Zerelday Cacey, December 8, 1843, is overcome by proof of his prior marriage in Kentucky, and that his wife by that marriage was still living and undivorced at that time. This proof established the fact that the second marriage in 1843 was a nullity, conferring no marital rights whatever. A simple marriage ceremony will not make a man and woman husband and wife. Capacity and consent are absolutely essential, but celebration only contingently so. (*Thompson* v. *Thompson,* 114 Mass. 566; *Merriam* v. *Walcott,* 61 How. Pr. 377; *Rundle* v. *Pegram,* 49 Miss. 751.) Nor can sexual intercourse, which the parties know to be contrary to law, form even an element of marriage. *Peck* v. *Peck,* 12 R. I. 485; *Port* v. *Port,* 70 Ill. 484.

This formal marriage being void, do the facts and circumstances proved create a presumption of a lawful marriage of Lewis and Zerelday after the divorce in 1846? No record of any subsequent marriage has been produced, nor has any witness testified directly as to any such marriage; but it is strenuously insisted that the evidence will justify the court in presuming a common law marriage of the parties after the impediment to their legal union was removed.

While our statute prescribes certain formalities to be observed in marriages, and certain steps to be taken to preserve the evidence of their celebration, it does not declare a marriage void which is legal at the common law, merely because not entered into in accordance with its provisions. (*Port* v.

*Port,* 70 Ill. 484.) A marriage is a civil contract, made in
due form, by which a man and woman agree to take each
other for husband and wife, during their joint lives, unless it
is annulled by law, and to discharge towards each other the
duties imposed by law upon such relation. Each must be
capable of assenting, and must, in fact, consent, to form this
new relation. If a statute forbids the solemnization of mar-
riage without a license, still, in the absence of a clause of
nullity, the marriage will be good though no license was had.
(1 Bishop on Marriage and Divorce, sec. 284.) The proof here
fails to show any license for the marriage of Lewis after the
divorce, but, on the contrary, the clerk of the county court,
the keeper of the public records relating to marriages, testi-
fied that he had carefully examined those records, and failed
to find any other marriage license than that issued in 1843,
nor is there any direct evidence of any marriage of the parties
after the divorce, *per verba de presenti,* or *per verba de futuro
cum copula;* but the court is asked to infer such a marriage
from the long continued cohabitation of the parties, and their
reputation of being married at some time. When the con-
sent to marry is manifested by words *de presenti,* a present
assumption of the marriage *status* is necessary. As said in
*Van Tuyl* v. *Van Tuyl,* 57 Barb. 237: "As the law stands, a
valid marriage, to all intents and purposes, is established by
proof of an actual contract, *per verba de presenti,* between
persons of opposite sexes, capable of contracting, to take each
other for husband and wife, especially where the contract is
followed by cohabitation. No solemnization or other formal-
ity, apart from the agreement itself, is necessary. Nor is it
essential to the validity of the contract that it should be made
before witnesses,"—citing *Clayton* v. *Wardwell,* 4 N. Y. 230;
*Cheney* v. *Arnold,* 15 id. 106; *Tummalty* v. *Tummalty,* 3 Bradf.
372; Hubback on Succession, chap. 4, sec. 1. On the other
hand, it is not sufficient to agree to present cohabitation and
a future regular marriage when more convenient, or when a

wife dies, or when a ceremony can be performed. (*Robertson* v. *State*, 42 Me. 509; *Duncan* v. *Duncan*, 10 Ohio St. 182; *Beverson* v. *Beverson*, 47 Cal. 621; *Fryer* v. *Fryer*, Rich. Eq. 85; *Van Tuyl* v. *Van Tuyl*, 57 Barb. 235; 1 Bishop on Marriage and Divorce, sec. 262.) To constitute marriage, the consent must not be attended by an agreement that some intervening thing shall be done before the marriage takes effect, as, that it be publicly solemnized. 1 Bishop on Marriage and Divorce, sec. 249.

In *Hantz* v. *Sealy*, 6 Binn. 405, the plaintiff and defendant had long lived in adulterous intercourse, although they considered themselves as lawfully married. In fact, they had entered into a marriage contract which was void, because the defendant had a former wife living, from whom he had been separated by consent, but not legally. After a legal divorce was procured, they were advised by their lawyer to celebrate a new marriage. The defendant said: "I take you (the plaintiff) for my wife," and the plaintiff, being told if she would say the same thing the marriage would be complete, answered, "To be sure, he is my husband,—good enough." The court held that these words of the woman did not constitute a present contract, but alluded to the past contract, which she always asserted to be a legal marriage.

Where parties competent to contract have agreed to marry at some future time, if they have *copula*, which is lawful only in the married state, in the absence of any evidence to the contrary they will be presumed to have become actually married by taking each other for husband and wife, and to have changed their future promise to marry, to one of present marriage. In such a case the *copula* will be presumed to have been allowed on the faith of the marriage promise, and that the parties, at the time of such *copula*, accepted each other as man and wife. (*Port* v. *Port*, 70 Ill. 484; *Hebblethwaite* v. *Hepworth*, 98 id. 126.) This kind of a marriage must be distinguished from cases of seduction, or sexual in-

tercourse followed by a promise of marriage, and cases where the intercourse, in its inception, is illicit, and is known to be such.   *Cheney* v. *Arnold,* 15 N. Y. 345 ; *Duncan* v. *Duncan,* 10 Ohio St. 181 ; 1 Bishop on Marriage and Divorce, sec. 261.

The evidence in the record is amply sufficient to show that Lewis and Zerelday lived and cohabited together as husband and wife for a period of about twenty-five years, and that during all this time he treated her as a man would a wife, and her children as his own, and that they were reputed as husband and wife.   But it must be borne in mind that cohabitation and repute do not constitute a marriage, but are only evidence tending to raise a presumption of marriage, of more or less strength, according to the circumstances of the case, and that the cohabitation must not be meretricious, but matrimonial, in order to give rise to this presumption. (1 Bishop on Marriage and Divorce, sec. 266.)   Where a marriage in fact is shown by direct evidence, as in this case, there is no necessity for presuming its existence.   Presumption must yield to the superior force of direct and positive proof.   In this case there was an actual marriage ceremony performed in 1843, by which Lewis and Zerelday were apparently and ostensibly married.   Their cohabitation thereafter, and reputation as to being married, might very naturally and properly be referred to the fact of this apparent marriage, there being nothing to indicate to their acquaintances and neighbors that it was void.   If no actual marriage ceremony had been shown, then the cohabitation and repute proved might be referred to some supposed informal, common law marriage.

This cohabitation and repute is not shown as evidence of the ceremonial marriage in 1843, but of some other kind of marriage entered into some time after the divorce in December, 1846.   Is such cohabitation and repute based upon a supposed common law marriage, any more than upon the formal marriage, shown by the records to have been entered into in 1843 ?   The habit and repute shown in this case might

just as well, and more naturally, arise from the marriage in 1843. If this evidence could, by any known rule, be so limited as to show a cohabitation and repute from some day after the divorce, when no impediment existed, it might afford evidence of a common law marriage of the parties by their own acts. If the cohabitation and repute were the result of the assumed marriage in 1843, which was void, it was illicit, and not matrimonial, and no marriage can be presumed from illicit sexual intercourse.

Their cohabitation being meretricious in its inception, at least so far as Lewis is concerned, was it changed by the divorce in Kentucky, and rendered thereafter matrimonial? This would seem to depend upon the intention of the parties, and the fact whether they had knowledge of the divorce removing the only impediment there was to their marriage. There is no proof in the record that either Lewis or Zerelday had ever been informed of the divorce, or that she ever knew that he had a former wife. Without knowledge of the removal of the impediment they could not have intended a second marriage, or have attempted to enter into another marriage. Courts can not marry parties by mere presumption, without their consent. In the absence of consent, the *status* of marriage is never created by any government. The law compels no one to assume the matrimonial *status*. Without assent, no statute or constitution can create this relation. (*Dickerson* v. *Brown*, 49 Miss. 373.) In *Turpin* v. *Public Administrator*, 2 Bradf. 424, the surrogate said: "When parties are living in a meretricious state, a promise to marry on some future condition does not effect a marriage by a mere continuance of that connection."

What evidence is there that Lewis ever consented to, or even desired, to change his connection with Zerelday from an illicit to a matrimonial one? He took no steps to remove the impediment to his marriage with her. The divorce was

not sought by him, but was obtained by his former wife in 1846. If he had no knowledge of this divorce, it can not be presumed that he would have married the same woman. If he had notice of the divorce, and desired to change his connection with Zerelday into that of marriage, it was an easy matter for him to have had solemnized a legal marriage, or for the parties in some public manner to have indicated an intention to enter into that relation; but this was never attempted.

It may be said that the holding of Zerelday out to the world as his wife, showed a desire to change his connection with her to that of marriage. But little importance can be attached to this circumstance, when considered in connection with the other facts of the case. A concubine is often held out to the world as a wife, to conceal an illicit cohabitation and prevent a criminal prosecution. And in addition to this, if he desired to change his former connection, there was an easy way open to him. The holding of her out as his wife before the divorce, was a fraud and a deception, and if Lewis would attempt to deceive the public by creating false appearances prior to December, 1846, why may not his subsequent acts also have been equally deceptive and fallacious?

As said before, there is no evidence in the record showing that Zerelday ever knew that Lewis had a wife living at the time she supposed she married him. She was deceived and imposed upon by Lewis, in his falsely assuming to have capacity to marry her, and in concealing the fact of his prior marriage to a then living and undivorced wife. Not knowing of the former marriage, she could have had no reason for desiring a second marriage. If she regarded herself as the lawful wife of Lewis, it would be a violent presumption to hold that she assented to a second informal marriage. If she knew of the prior marriage, then her cohabitation with Lewis was meretricious in its inception, and could only be changed after the disability of Lewis was removed, and then

only by the mutual consent of both. If she had notice of the illegality of her marriage after the divorce, and cohabited with Lewis after that, without a new marriage, it was criminal. If she desired to make her subsequent connection with him lawful, she no doubt would have insisted upon a public or statutory marriage, so as to preserve the evidence of the same. Marriage may be shown by circumstantial as well as by direct evidence. It may, in a proper case, be inferred from continuous cohabitation and repute, when nothing appears to prevent the raising of the presumption created by the proof of these facts. If the cohabitation was, in its inception, illicit, the presumption of the innocence and morality of the parties is at once rebutted and overcome, and without proof of a change in their relation to each other, it will be presumed that the continuance of the connection of the parties is of the same character. *Floyd* v. *Calvert,* 53 Miss. 37.

Bishop, in his work on Marriage and Divorce, (sec. 506,) says: "If parties come together, intending and choosing an illicit commerce, there being no impediment to marriage, it can not be presumed, without reasons, whatever the law under which they live, that they have altered their choice, for a condition of things once shown is presumed to continue; and it can make no difference in this, that an impediment to marriage, existing when the cohabitation began, was afterwards removed."

In the State of Mississippi the constitution provided that all persons who have not been married, but are now living together, cohabiting as husband and wife, shall be taken and held, for all purposes in law, as married, etc. The Supreme Court of that State held that where a person claims to be married thereby, there must be some formal and explicit agreement between the parties that they will and do accept the new organic law as establishing thenceforth between them a new relationship, or there must be such open and visible change in the conduct and declarations of the parties, that

an agreement to accept the new law might fairly be inferred. *Floyd* v. *Calvert,* 53 Miss. 37 ; *Dickerson* v. *Brown,* 49 id. 357.

Where both parties are married in the honest belief, founded on an apparently good reason, that they are capable of entering into the marriage contract, when in fact one of them is not, if they .continue to cohabit as man and wife after the removal of the impediment to their lawful union, the law will presume a common law marriage by the acts of the parties, in the absence of any evidence to prevent such presumption. In such a case there are many strong and cogent reasons for presuming a new marriage after the removal of the impediment, even though the parties may not have known of its removal. There the cohabitation, in ignorance of facts rendering it illegal, is not to be regarded as meretricious or criminal until the parties have knowledge of such facts. Their purpose in such a union is honorable marriage, which the law favors, and not mere illicit intercourse. The fact that Mrs. Lewis had no knowledge of the invalidity of the marriage, and therefore the cohabitation on her part was not criminal, can not validate the assumed marriage, even as to her. If valid as to her, it must be equally so as to him. A contract not mutually binding, is void for want of mutuality. The most that can be said is, that Mrs. Lewis was not liable to criminal punishment for living with a man she supposed, in good faith, was her husband.

In *Randlett* v. *Rice,* 141 Mass. 385, one Alexander, in 1836, was married to A, in the State of Vermont, where he resided with her up to 1863, when he left her and went to Canada with another woman, after whose death, in the same year, he came to Portsmouth, New Hampshire, where he married B, in December, 1864. On September 11, 1867, he married C. A died in May, 1866. Neither Alexander nor A ever procured a divorce. It was contended that the cohabitation of Alexander with B, after the death of his first wife, A, in May, 1866, and before his marriage to C, in 1867, was evidence of a mar-

riage between him and B, and therefore his marriage with C, in 1867, was void. The court say: "The cohabitation was the only evidence of a marriage, and in this case the cohabitation points only to the illegal contract of marriage under which it commenced. The parties had no thought of any other marriage. The testimony of the supposed wife shows this, and the fact that she did not know of the existence of the legal wife, and that Alexander did not know of her death, forbids any presumption that they made a new contract in consequence."

In *Harbeck* v. *Harbeck,* 102 N. Y. 714, which was a bill for a divorce, the issue was, whether the parties were married, no ceremony having been performed. The plaintiff was formerly the wife of Montgomery, who abandoned her. She lived with the defendant until 1879, passing as his wife, both believing that Montgomery was dead, which was not true. The court said: "That the union between the parties was at first illegal, is conceded. If a change occurred, it was followed by no formal celebration. Nor is there evidence of any present agreement to take each other for husband and wife. And that they ever passed, by contract or by mutual consent, from the state of concubinage to that of marriage, is doubtful, by the admissions of the plaintiff, proven by the testimony of her sister, and by the defendant's father, and by other witnesses. If that testimony is true, it is difficult to find that she herself regarded the connection as matrimonial, or that its continuance depended upon anything more binding than the inclination or will of the defendant. It is true that he assumed the character of husband and she that of wife, and reported themselves in that relation to their associates and others," etc.

In *Appeal of Reading Fire Ins. Co.* 113 Pa. 204, the Supreme Court of Pennsylvania say: "Undoubtedly they lived together for a long time, under circumstances to prove intimate sexual relations; but cohabitation and reputation, alone, are not marriage—they are merely circumstances from

which a marriage may sometimes be presumed. It is a presumption, however, that may be rebutted by other facts and circumstances. (*Hunt's Appeal*, 86 Pa. St. 294.) When the relation between a man and a woman living together is illicit in its commencement, it is presumed to so continue until a changed relation is proved. Without proof of subsequent actual marriage, it will not be presumed from continued cohabitation and reputation of a relation between them which was of illicit origin. Here the evidence establishes, with sufficient certainty, that in its inception the relation between the appellee and Riegel was illicit, and there is no sufficient evidence to create a legal presumption of any subsequent marriage."

It is said that the presumption in favor of innocence, and against immorality and guilt, is so strong as to give rise to the presumption of a marriage. This is so in many cases, but such presumption of marriage will not arise if it will involve one of the parties in guilt,—as, where a man is cohabiting with two women, or where one of the parties is proved to be married to some one else. *Williams v. State,* 44 Ala. 44; *Case v. Case,* 17 Cal. 598; *Harrison v. Lincoln,* 48 Me. 205; *Jones v. Jones,* 45 Md. 144; *Emerson v. Shaw,* 56 N. H. 418; *Senser v. Bower,* 1 Pa. 450; *Weinberg v. State,* 25 Wis. 370. The courts, in favor of a second marriage, will often presume the death of a prior husband or wife, when not heard from for a much less period than seven years. *Commonwealth v. Boyer,* 7 Allen, 306; *Rex v. Twining,* 2 B & A. 386; *Greenborough v. Underhill,* 12 Vt. 604; *Harris v. Harris,* 8 Bradw. 57; *Dixon v. People,* 18 Mich. 84; *Yates v. Houston,* 3 Texas, 449; *Senser v. Bower,* 1 Pa. 450; *Johnson v. Johnson,* 114 Ill. 611. So they will often presume a previous divorce in order to sustain the second marriage. *Blanchard v. Lambert,* 43 Iowa, 228; *Hull v. Rawls,* 27 Miss. 471; *McCarty v. McCarty,* 2 Strobh. 6; *Carroll v. Carroll,* 20 Texas, 731; *In re Edwards,* 58 Iowa, 431. In the present case, the evidence excludes any presumption of the death of the

first wife of Lewis, she being alive after his death, and there can be no presumption that she obtained a divorce before his marriage in 1843, as the evidence shows her divorce was not granted until December, 1846, and the established facts will not justify the court in presuming that he procured a divorce from his prior wife. He was married to Sarah James, April 29, 1841, and lived with her about a year, when he left her and came to this State, where he was ostensibly married to Zerelday Cacey, December 8, 1843, only about a year and seven months after his abandonment of his first wife. If he procured any lawful divorce, it must have been in Caldwell county, Kentucky, or in Montgomery county, Illinois. If he procured such a divorce, it was a very easy matter to have shown it. Under the circumstances of this case, and taking into consideration the shortness of the time intervening from his desertion of his first wife and his second marriage, it can not be presumed, in favor of the innocence of the parties and the legality of the second marriage, that Lewis obtained a legal decree releasing him from his prior marriage.

The point is made, that the plaintiffs in error are barred by *laches* in asserting their rights. The bill was filed March 2, 1885, about seventeen years after the death of Lewis, so that the suit is not barred by the twenty years limitation law. The defendant in error having no color of title, is not in a position to invoke the seven years limitation law. To establish a bar under the limitation law of 1839, the possession and payment of taxes for seven successive years must be under color of title. (*Stoltz* v. *Doering*, 112 Ill. 234; *Heacock* v. *Lubuke*, 107 id. 396.) As a general rule, courts of equity follow the law in applying the Statute of Limitations. The plaintiffs in error not being barred at law of the right to assert an interest in the lands, are not precluded by *laches* from maintaining this bill.

The decree of the circuit court will be reversed, and the cause remanded.

*Decree reversed.*