484    PORT *v.* PORT *et al.*    [Sept. T.

Syllabus.

---

# NELLIE PORT

*v.*

## SARAH PORT *et al.*

1. MARRIAGE—*presumption of.* The cohabitation of two persons of different sexes, and their behavior, in other respects, as husband and wife, always afford an inference, of greater or less strength, that a marriage has been solemnized between them; yet such inference is destroyed by evidence that no marriage, in fact, ever was solemnized.

2. SAME—*whether valid if entered into according to common law.* Where the statute does not prohibit or declare void a marriage not solemnized in accordance with its provisions, a marriage without observing the statutory regulations, if made according to the common law, will still be valid.

3. SAME—*evidence of, at common law.* By the common law, if the contract is made *per verba de presenti*, it is sufficient evidence of a marriage. If it be made *per verba de futuro cum copula*, the *copula* is presumed to have been allowed on the faith of the marriage promise, and that the parties, at the time of the *copula*, accepted of each other as husband and wife; but this is only a rule of evidence, and it is always competent, in such cases, to show that the fact was otherwise.

4. If the woman, in surrendering her person, is conscious that she is committing an act of fornication, instead of consummating her marriage, the *copula* can not be connected with any previous promise, and marriage is not thereby constituted.

APPEAL from the Circuit Court of Cook county; the Hon. WILLIAM W. FARWELL, Judge, presiding.

Messrs. ROSENTHAL & PENCE, for the appellant.

Mr. GEO. W. THOMPSON, and Mr. EVERT VAN BUREN, for the appellees.

Mr. JUSTICE SCHOLFIELD delivered the opinion of the Court:

This record presents only the single question, is the complainant the widow of Silas Port, deceased?

It was proved, by a number of witnesses, that Silas Port and the complainant lived together, in rooms which he had rented at 457 South Clark street, Chicago, from May, 1870, until his death, in March, 1872. During this time, they ate and slept together, and, in other respects, deported themselves towards each other, apparently, as husband and wife. On a few occasions, they attended places of public amusement, where he introduced her as his wife. He frequently spoke of her, in the presence of others, as his wife, and introduced her to some of his acquaintances and friends by that designation.

It is, no doubt, true, that the mere cohabitation of two persons of different sexes, or their behavior, in other respects, as husband and wife, always affords an inference, of greater or less strength, that a marriage has been solemnized between them. Their conduct being susceptible of two opposite ex-

486      Port *v.* Port *et al.*      [Sept. T.

Opinion of the Court.

planations, we are bound to assume it to be moral, rather than immoral; and credit is to be given to their own assertions, whether express or implied, of a fact within their own knowledge. *Canjolle* v. *Ferrie,* 23 N. Y. 107; 2 Greenleaf's Evidence, sec. 462; 1 Bishop on Marriage and Divorce, secs. 13, 457, and note. But, in the present case, it is admitted no marriage was, in fact, ever celebrated between the parties, in any mode prescribed by our statute. It is claimed, however, that there was a valid common law marriage between them, and it is to this inquiry our attention must be directed.

We are inclined to the opinion, supported as it is by the statements of many of the most eminent text writers, as well as by the decisions of courts of the highest respectability, that, inasmuch as our statute does not prohibit or declare void a marriage not solemnized in accordance with its provisions, a marriage without observing the statutory regulations, if made according to the common law, will still be a valid marriage, and that, by the common law, if the contract be made *per verba de presenti,* it is sufficient evidence of a marriage; or, if it be made *per verba de futuro cum copula,* the *copula* is presumed to have been allowed on the faith of the marriage promise, and that so the parties, at the time of the *copula,* accepted of each other as man and wife. Bishop on Marriage and Divorce, secs. 253, 254.

This is, however, merely a rule of evidence, and it is always competent, in such cases, to show by proof that the fact was otherwise. 1 Bishop on Marriage and Divorce, sec. 259; *Myatt* v. *Myatt,* 44 Ill. 473; *Conant* v. *Griffin, Admr.* 48 id. 410. The rule is well illustrated by the language of Lord CAMPBELL, in *The King* v. *Millis,* 10 Clark & Fin. 534, 782, quoted by Bishop in the paragraph last referred to: "If the woman, in surrendering her person, is conscious that she is committing an act of fornication, instead of consummating her marriage, the *copula* can not be connected with any previous promise that has been made, and marriage is not thereby constituted." Upon this principle, it was held in *Becking's Appeal,* 2 Brewst.

(Pa.) 202, " a man may live with his kept mistress in such a way as to create a kind of repute of marriage, among some persons; may, in order to gratify her, hold himself out to her acquaintances as her husband; may be a constant visitor, and often eat and sleep at her house; may recognize the fruit of the connection as his children, and manifest affection for them; and yet the evidence may fall far short of that which ought to satisfy the mind that there was an actual agreement to form the relation of husband and wife." See, also, *Physic's Estate*, id. 179; and in a Scotch case, also referred to by Bishop, in sec. 259 (*Forbes* v. *Countess of Strathmore*, Ferg. Consist. Law Rep. 113), " where a countess, after a promise of marriage with her footman, yielded to his embraces, it was conceded, by all the counsel and the court, that marriage would not be presumed, there being such a disparity of rank and circumstances as rendered probable her allegation that she had rather chosen to indulge a licentious passion than degrade herself from her high rank and station in society, by espousing her own menial servant."

There is no pretense that there was a contract between these parties to marry, *per verba de presenti*, and we strongly incline to the belief, from the evidence, that Port always refused to agree to marry, at any time. Appellant, it is true, swears that there was a contract to marry in the future, but Olter swears that, about three weeks before Port's death, appellant was crying, and he asked her what was the matter. She replied that her uncle was going to have them arrested for living in a state of adultery; that she had been pleading with deceased to marry her, and he would not do it; that she, in the morning, asked him to marry her, and he answered her in language of contempt, too obscene for repetition. The witness says, on another occasion he said to appellant, alluding to the way in which she and deceased were living together: "It is no way to live, this way." She replied: "He never will talk marry to me at all, from the first time he ever went with me."

William Port also swears, while they were on the road from Chicago to Cambridge City, Indiana, whither they were taking the dead body of Port for burial, he asked appellant if she was married to the deceased, to which she replied that she was not. He then asked her whether the deceased ever promised to marry her, and she answered that he did not. Each of these conversations is emphatically denied by appellant, and a question of veracity is thus presented, in which she is, to say the least, unfortunate in not being corroborated. William Port is certainly interested in the result of the suit, and it may be, that this interest, in some degree, biases his evidence; but appellant is likewise interested therein, and to a greater extent than he is. Olter, however, appears to be entirely disinterested.

From the reading of this record, we perceive nothing from which we can conclude that William Port and Olter are not entitled to quite as much respect and confidence, as witnesses, as is appellant. The preponderance, then, upon this point, is against her. She is successfully contradicted, and we can not say that the court below erred, even if its decision could only be sustained on this view of the case.

But, if we shall concede that the evidence sufficiently shows there was a contract between these parties to marry in the future, it is certain that neither of the parties, in the lifetime of Port, ever considered that the contract was consummated. No children were born to them, and, aside from the inferences to be drawn from their residing together, the only evidence of *copula* is in admissions of the criminal character of their cohabitation. The relatives of neither party ever regarded or treated them as married, and the uncle of appellant, and the mother of the deceased, at different times, threatened to prosecute them for living together in an open state of fornication. Appellant virtually admitted that she was guilty of this charge. She did not deny it, or pretend that she had supposed they were married, or that she had been deluded to act as she had, under representations that it would constitute

them man and wife. She cried, and appealed to deceased to
marry her—the only way by which her guilt could be atoned.
She says, upon one occasion the deceased "said he would have
to marry her; that he could not live so." Live how? What
did deceased understand, and what did she understand, by
that remark? Manifestly, there can be but one answer: "in
a state of fornication." This was after they had lived
together some time, and after, she says, he had first promised
to marry her. No allusion was made to anything which had
been done in consummation of a marriage contract, and there
was no pretense that either of them then thought they were
informally or otherwise married. In the same conversation
she further states he said, "his mother wouldn't let him live
so, and he would marry her that fall—in a few weeks." This
was not done, and there does not appear to have been a word
or act between them, subsequently, which was intended or
understood by either of them to have been in consequence of
that promise. She also says, upon one occasion Olter told
her that the mother of the deceased, with whom he had then
recently been in conversation, after inquiring about appellant,
said, " she did not think it right for Silas to live so, and that
if he did not marry appellant, she would punish him—put
him in jail." Appellant did not then attempt to excuse her-
self by claiming that they had done what they had on the
faith of a marriage, or that she had been deluded and deceived
by deceased, or otherwise, into the belief that they were, in
fact, husband and wife. The only attempted extenuation
interposed by appellant, at any time, for her conduct, was
accompanied by an admission of her knowledge that their
intercourse was illegal. It was, that she was not to blame,
for she had repeatedly asked deceased to marry her, and he
would not do it, but kept putting it off. To Deborah Olter,
she said, about three days after Port's death, she was never
married to him. The witness observed, she did not see how
she could live with him in that way, without being married,
and her only reply was, that half of Chicago lived in that

way. To Mrs. Crocker, on the day of Port's death, she also said she was not married to him. In excuse for these statements, which she does not deny, she says that she then thought some ceremony was necessary, to constitute a marriage, but she points to no preceding act or agreement between them which was intended by them as or on account of a marriage. She being a witness, if truthful, nothing is left to inference. She knows all that was said, and, on her part at least, all that was intended between them. It is her interest to disclose everything tending to establish her marriage, and the presumption is, she has done so, yet Port went to his grave, intending to be, and believing he was, an unmarried man, and she never discovered that she was a widow, until some time subsequent to his death. Can it be possible, that parties can be lawfully married, when neither intend or know it? We think not. Appellant admits that the promise to marry was in the future, and she also shows that it ever continued to be in the future. If, prior to copulation, or as a condition thereto, their minds were, in fact, changed, and the future promise was converted into a present one, it is a fact which she must have known. That she does not state that any such change ever occurred, but, on the contrary, that Port kept putting her off, is conclusive against the presumption that there was such change. Believing, as she says, that a ceremony was necessary to constitute marriage, it would not be reasonable to suppose that they had done anything else which they intended or expected to be a consummation of the marriage contract. And, so believing, it also necessarily follows, in the language of Lord CAMPBELL, before quoted, "in surrendering her person, she was conscious that she was committing an act of fornication." There is this distinction between the present case and those referred to by counsel, where it was held, that the fact that the party had doubts as to the validity of her marriage, did not prejudice her rights. In those cases, something was done *intended as a marriage.* Here, there was nothing of the kind.

The only theory upon which appellant's claim can be sustained is, that a contract *per verba de futuro cum copula,* is not merely presumptive evidence of a marriage, liable to be rebutted and overcome by other evidence, but that it is conclusive of the question, which is not, and is not claimed to be, the law.

The conduct of Port, in introducing appellant as, and calling her, his wife, when considered in connection with the other evidence, proves merely a desire to avoid the odium and danger to which they would have been exposed if the truth had been known, and hence does not impair the force of the other testimony, direct and conclusive as it is in its nature.

The decree of the court below must be affirmed.

*Decree affirmed.*