## MARY HEBBLETHWAITE *et al.*

*v.*

## MARY HEPWORTH.

*Filed at Ottawa September 25, 1880—Rehearing denied March Term, 1881.*

1. MARRIAGE—*who may contract marriage, and what constitutes that relation.* Persons having a husband or wife living are not competent to contract marriage, and no presumption of a marriage can be indulged from cohabitation by such persons.

2. The statute does not prohibit or declare void a marriage not solemnized in accordance with its provisions. A marriage without observing the statutory regulations, if made according to the common law, will be good.

3. By the common law, if the contract be made *per verba de presenti,* it is sufficient evidence of marriage, or if made *per verba de futuro cum copula,* the *copula* will be presumed to have been allowed on the faith of the marriage promise, if at the time of the *copula* the parties accepted each other as husband and wife. It is the consent of the parties, and not the concubinage, that constitutes valid marriage.

4. A contract of marriage *per verba de futuro,* while it may give an action, is not evidence of valid marriage; nor are the relations of the parties changed by the fact that cohabitation may have followed the promise to marry at a future time. A contract of marriage in the future, even when the parties may afterwards cohabit, is not understood to constitute marriage, unless the parties at the time of the cohabitation accept each other as husband and wife, and so conduct themselves that that relation is understood and acquiesced in by relatives and other acquaintances.

APPEAL from the Circuit Court of Cook county ; the Hon. MURRAY F. TULEY, Judge, presiding.

Mr. H. B. HURD, for the appellants:

The prime requisite of a valid marriage under our law is the interchange between the parties of a mutual present consent to take each other as husband and wife. For this consent there is no substitute or equivalent. *Port* v. *Port,* 70 Ill. 484; *Clayton* v. *Wardell,* 4 Comstock, 230; Lord CAMPBELL in *Queen* v. *Millis,* 10 Clark & Finnelley, 749; *Williams* v. *Williams,* 46 Wis. 464.

The modes of proving the existence of such consent are various, but they should never be confounded with the consent itself, which is always the same. *Shedden* v. *Patrick*, L. R. (1 H. L. Pr. & Div.) 540, 541.

Proof of cohabitation as husband and wife does not constitute marriage. It may in some cases be evidence of marriage, but can never be anything more; "*consensus non concubitus facit nuptias*" is the universally received maxim. *Port* v. *Port*, 70 Ill. 484; *Shedden* v. *Patrick, ubi supra; Letters* v. *Cody*, 10 Cal. 583; *Jackson* v. *Winne*, 7 Wend. 47; *Cheney* v. *Arnold*, 15 N. Y. 345; *Duncan* v. *Duncan*, 10 Ohio St. 181.

If the agreement is not one of present consent to accept each other as husband and wife, but is *per verba de futuro*, looking to a marriage at some future time, it not only fails to prove actual marriage, but by its very terms excludes any such conclusion. Lord COTTENHAM in *Stewart* v. *Menzies*, 2 Rol. App. Cases, 547, 590; *Cheney* v. *Arnold*, 15 N. Y. 345; *Foster* v. *Hawley*, 15 Hun, (N. Y.) 68; *Rundle* v. *Pegram*, 49 Miss. 751; *Floyd* v. *Calvert*, 53 Miss. 37.

Divided reputation is not sufficient proof of marriage. The repute should be open and general, and prevail among the friends and relatives of both parties. *Floyd* v. *Calvert*, 53 Miss. 37; *Yardley's Estate*, 75 Penn. St. 207; *Clayton* v. *Wardell*, 4 Comstock, 230; *Bicking's Appeal*, 2 Brewster, 202.

If cohabitation is illicit in its origin, there is a necessary presumption that the connection continues meretricious, unless there is some evidence that the character of the relation has been changed. *Williams* v. *Williams*, 46 Wis. 464; *Cunningham* v. *Cunningham*, 2 Dow, 483; *Stewart* v. *Robertson*, Law Rep. 2 Sc. Ap. 494, S. C.; *Yardley's Estate*, 75 Penn. St. 207; *Commonwealth* v. *Stump*, 53 id. 132; *Bicking's Appeal*, 2 Brewst. (Pa.) 202; *Wright* v. *Wright*, 48 How. Pr. (N. Y.) 1; *Barnum* v. *Barnum*, 42 Md. 257; *Redgrave* v. *Redgrave*, 38 id. 93; *Jackson* v. *Claw*, 18 Johns. 346; 2

Greenleaf on Evidence, § 464; 2 Kent's Commentaries, 87; *Port* v. *Port*, 70 Ill. 484; *Jones* v. *Jones*, 45 Md. 144; *Floyd* v. *Calvert*, 53 Miss. 37 ; *Rundle* v. *Pegram*, 49 id. 751.

* When the cohabitation is illicit in its origin, the circumstances in favor of marriage must be such as to exclude the inference or presumption that the former relation continued. *Fisher* v. *Hawley*, 8 Hun, (N. Y.) 65, 72; *Williams* v. *Williams*, 46 Wis. 464.

Mr. JAMES S. MURRAY, for the appellee:

Marriage may be proved by reputation, declaration and conduct of the parties. 2 Greenleaf on Evidence, § 462; Bishop's Marriage and Divorce, §§ 434, 438, 439; *Myatt* v. *Myatt*, 40 Ill. 474; *Port* v. *Port*, 70 id. 484; *Miller et al.* v. *White*, 80 id. 580.

Every intendment of law is in favor of marriage. Bishop on Marriage and Divorce, § 459; *Piers* v. *Piers*, 2 H. L. Cases, 321; *Campbell* v. *Campbell*, 1 Law Rep. Scotch and Divorce Appeals; *Hervey* v. *Hervey*, 2 W. Blackstone, 877; *King* v. *Twining*, 2 Barn. & Ald. 386 ; *Fenton* v. *Reid*, 4 Johns. 52; *Jackson* v. *Claw*, 18 id. 346; *Starr et al.* v. *Peck*, 1 Hill, 270; *In re Taylor*, 9 Paige, 610; *Caujolle* v. *Ferrie*, 23 N. Y. 91; *Tumalty* v. *Tumalty*, 3 Bradford, 369; *Town of Greensborough* v. *Underhill*, 12 Vt. 604; *Carroll* v. *Carroll*, 20 Texas, 731; *Hutchins* v. *Kimmell*, 31 Mich. 130; *State* v. *Worthingham*, 31 Minn. 539 ; *Hyde* v. *Hyde*, 3 Bradford (N. Y.) 509; *Grotgen* v. *Grotgen*, 3 id. 373; *Yates* v. *Houston*, 3 Texas, 433; *Kelly* v. *Drew*, 12 Allen, 110; *Hull* v. *Rawls*, 27 Miss. 471 ; *Spears* v. *Benton*, 31 id. 547; *Chapman* v. *Cooper*, 5 Rich. (S. C.) 452 ; *Nathan's case*, 2 Brewster (Pa.) 149 ; *Purcell* v. *Purcell*, 4 Hen. & M. 507.

Verbal admissions, purporting to have been made after a controversy has arisen, are entitled to little weight. *In re Taylor*, 9 Paige, 610; *Nathan's case*, 2 Brewster (Pa.) 149; 1 Greenleaf on Evidence, sec. 200.

The presumption of innocence overcomes the presumption of life, even where the absence falls short of seven years. Bishop on Marriage and Divorce, sec. 452; *Rex* v. *Twining*, 2 Barn. & Ald. 386; *Jackson* v. *Claw*, 18 Johnson, 346; *Gates* v. *Houston*, 3 Texas, 433; *Kelly* v. *Drew*, 12 Allen, 110; *Hull, Admr.* v. *Rawls*, 27 Miss. 471; *Spears* v. *Burton*, 31 id. 547; *Chapman* v. *Cooper*, 5 Richardson (S. C.) 452; *Town of Greensborough* v. *Underhill*, 12 Vt. 604; *Carroll* v. *Carroll*, 20 Texas, 731.

Mr. JUSTICE SCOTT delivered the opinion of the Court:

The eventful and sad history of complainant has induced a most careful consideration of the entire record in this case. Equitable considerations would seem to demand an affirmance of the decree of the circuit court, if any tenable ground could be discovered on which to base such a decision. The bill is for partition and dower in the lands alleged to belong to the estate of Henry Hepworth, deceased, and was brought by Mary Hepworth, claiming to be his widow. The decedent left no child or descendants of any child. Defendants are his collateral heirs. No question is made, if complainant is the widow of the intestate, she would be entitled to one-half of the real estate of which the intestate died seized, and dower in the other half. Most important of all questions made on the record is, whether complainant was the wife of the intestate, as she alleges she was, and to that inquiry we will direct our investigation. All the parties were English people, and, before coming to America, resided in Leeds, England. Decedent, Henry Hepworth, had a wife, with whom he resided up to the time he left England to come to this country, and complainant had been and was a married woman before leaving England. Her husband had, however, been transported, under judicial sentence, for "poaching," for a period of fourteen years. A party, consisting of the intestate, complainant and a married daughter of complainant and her husband, and, perhaps, one child, came on the

same vessel to New York. On their arrival, the daughter testifies, decedent and complainant went out to get married, and, on their return, declared that they were married. Immediately thereafter they all started West. That was in 1847. Soon after their arrival in Chicago, decedent secured a farm near the village of Evanston, in Cook county, where he and complainant resided together as husband and wife until 1856. It was in that year a Mrs. Marshall, a foster daughter of decedent, came to visit them. It was not long afterwards until the true relations of the parties became known to the public, and decedent was arrested on complaint for living in an open state of adultery with complainant. The prosecution does not seem to have been pressed. Some settlement was made between the parties, and decedent paid complainant $300. The agreement between them was evidenced by writing and signed by complainant, in which the payment of the money was acknowledged, and also the justness of the accusation against them. It was distinctly stated they were not husband and wife, and the fact of the former marriage of both parties was also stated. After the settlement they lived apart, as was the agreement. Complainant went out to service for a brief period in Chicago, but soon returned to Evanston, where she secured a home of her own, and maintained herself and grandson, who resided with her, by her own labor.

While complainant and decedent lived on the farm together, she did such work as farmers' wives usually do, and, in addition thereto, she often worked in the field. By their united labor and the exercise of economy, Hepworth acquired a considerable property, aggregating many thousand dollars. It is shown complainant is an uneducated woman, being unable either to read or write, but she was always kindly regarded by all her neighbors with whom she was acquainted. She was a member of one of the principal Methodist churches of the village of Evanston, and during her long residence in the midst of that people, nothing was ever alleged against her character, barring her relations with the intestate. She is

now nearly or quite eighty years old, broken in health and dependent on public charity for support.

Evidence introduced shows, that in 1864 Hepworth obtained a divorce from his wife, then residing in England. The divorce was obtained in one of the courts of Cook county, but the record was destroyed in 1871, by the fire that destroyed all the public records of that county. It is sufficiently proved, however, that the divorce, for some cause not disclosed, was, in fact, granted. It is made to appear, that from the time of their separation in 1856, until 1866, the parties lived separate and apart. During that period complainant supported herself, as well as she could, by her own labor and with the assistance of such aid as the public authorities of the town kindly bestowed on her.

In 1865, Hepworth came to the house of complainant, after she had retired for the night, and, on obtaining admission, he made a proposition to live with her again. She distinctly informed him, at that time, she would not consent to his proposition unless he would marry her, and one reason she assigned was, that unless he did it would injure her with the neighbors, who had been very kind to her. He assured her that he would, and that he had never before been in a condition when he could lawfully marry her. He continued to visit her frequently at her house, but always returned every night to his own lodgings, until sometime in 1866, when he came to reside permanently with complainant at her own house. After taking up his residence with her decedent provided for the family, and they cohabited as husband and wife, and seem to have been so treated by their neighbors. These relations continued between them until 1876, when decedent left home with a view, as he told her, to visit the "Centennial Exhibition," but, in fact, to go to England, which he did. He never returned to the house of complainant. After his return to Evanston in the spring of 1877, he made his home with his niece, one of the defendants, until his death, which occurred later in the same year.

Prior to the separation of the parties in 1855 or 1856, it can hardly be claimed the relation of marriage existed between them. Neither of them was competent to contract marriage. Both had previously been married, and the fact was well known to each of them. Complainant had been in the employ of decedent while they resided in England, and she was fully aware, when she fled the country with him, of the fact that his wife was still living. But, aside from these undisputed facts which forbid the idea of legal marriage, both of them conceded, at the time of his arrest on the charge of living in an open state of adultery, they had never been married. Living separate and apart from decedent, she assumed her former name, that of her husband, Greenwood, and by that name was most generally known. Up to that time the relations of the parties were plainly meretricious and unlawful,—a fact conceded by both parties in the most solemn manner.

The only question in the case that presents any difficulty is whether, on the second coming together of the parties, there was any valid marriage. It is not claimed there was any ceremonial marriage, and if any such relation existed between them it must have been a marriage as at common law. It is not necessary now to enter upon any discussion as to what constitutes valid marriage. In the recent case of *Port* v. *Port,* 70 Ill. 484, this court had occasion to investigate the subject, and the conclusion there reached was, our statute does not prohibit or declare void a marriage not solemnized in accordance with its provisions, but that a marriage without observing the statutory regulations, if made according to the common law, would be valid. The true relations between the parties is always a matter of evidence.

By the common law, if the contract be made *per verba de presenti,* it is sufficient evidence of marriage; or if made *per verba de futuro cum copula,* the *copula* would be presumed to have been allowed on the faith of the marriage promise, so that at the time of the *copula* the parties accepted each other

as husband and wife.   On this subject the maxim of the law is inexorable, that it is the consent of parties, and not their concubinage, that constitutes valid marriage.   The well being of society demands a strict adherence to this principle.

It can not be maintained there was any contract between the parties to marry *per verba de presenti.*   The utmost the evidence shows is, that on the occasion of his first visit to complainant, in 1865, he did promise to marry complainant. But it was to be at some future period.   That promise was never fulfilled.   This, we think, is plain, from the subsequent conduct of the parties.   After that promise was made decedent visited her frequently at her house for a period of eight months or a year before he went to live with her again.   It is true, that afterwards they did live and cohabit together as husband and wife, but under what contract, if any, does not appear.   On this branch of the case the evidence is silent. There is no more propriety in referring their conduct to marriage than to concubinage.   Indeed, her admissions, made when it was to the interest of complainant to declare otherwise, indicate the latter was the relation they bore to each other.   To some of her most intimate and best friends she admitted she was not married,—that he had been "putting her off from time to time."   These admissions were made shortly before and after the death of the intestate.   This view of the case is greatly strengthened by the fact that on account of their adulterous conduct, the intestate had been arrested and the parties compelled to live apart.   It is strange that, after their experience, when they came together again, if it was under a promise of marriage, it was not celebrated in the usual way, according to the custom of the country, by a clergyman or a magistrate, under a license, that a record might be made.   But nothing of the kind was done. All that is proven, if we give to the evidence the most favorable construction, is, that he promised to marry complainant but he died before fulfilling that engagement.   A contract of marriage *per verba de futuro,* while it may give an action, is

not evidence of valid marriage. Nor are the relations of the parties changed by the fact that cohabitation may have followed the promise to marry at a future time. *Port* v. *Port*, *supra*.

A contract of marriage in the future, even where the parties may afterwards cohabit, is not understood to constitute marriage, unless where, at the time of the cohabitation, the parties accept each other as husband and wife, and so conduct themselves that that relation is understood and acquiesced in by relatives and other acquaintances. Such was not the case here. Even the reputation as to the relation of the parties was divided in the neighborhood where they resided. Some thought they were married, but others did not. But it does not appear the parties, or either of them, ever understood they were, in fact, married. Her admissions, clearly and understandingly made, are to the contrary, and we are not at liberty to declare otherwise.

The decree will be reversed, and the bill dismissed.

*Decree reversed.*