## James McKenna v. Julia McKenna.

1. MARRIAGE—*Ceremony Not Essential to Validity of.*—Under the common law in force in this State, marriage is such a contract as may be entered into without ceremony or solemnization of any sort, and all that is necessary thereto is a distinct agreement of the parties followed by an assumption of the marriage *status.*

2. SAME—*Presumptions as to.*—1f the entire transaction between the parties is exposed by direct evidence, whether it amounts to a contract of marriage or not, the theory of presumption as to any other or different contract can have no place.

3. SAME—*Requisites of Valid Common Law Marriage.*—An agreement by words must, in order to constitute a valid contract of marriage, be followed by an assumption of the marriage *status,* and this whether the words be *de futuro,* when the marriage relationship must be assumed after the words have been followed by cohabitation, or *de presenti,* when a present assumption of the marriage relationship is essential. Nor does mere sexual intimacy alone constitute such assumption of the marriage *status;* there must be an ostensible relationship, recognized by relatives and other acquaintances.

4. STARE DECISIS—*Courts Must Enforce the Law Irrespective of the Hardship of Particular Cases.*—This court can not, either for the purpose of aiding the wronged or punishing the wrongdoer, violate settled principles of law, or adopt rules not recognized by authority, which however they might serve the exigency of a particular case, might work extreme injustice to innocent parties through future application. Strict adherence to just and well established rules of law, irrespective of the hardship of the case, is the duty of the courts.

Separate Maintenance. Appeal from the Circuit Court of Cook County, the Hon. OLIVER H. HORTON, Judge, presiding. Heard in this court at the October term, 1898. Reversed. Opinion filed January 6, 1898.

STRONG, STRUCKMANN, EHLE & MILSTED, attorneys for appellant.

The appellee has not made out a marriage at common law, and in such a proceeding as the present, the burden of proof is upon the party who asserts the marriage. Sharon v. Sharon, 75 Cal. 1; Arnold v. Chesebrough, 58 Fed. Rep. 833; 2 Scotch Appeals, 494; 13 Moak's Reports, 165.

It is necessary to a valid marriage that both parties should intend and consent to the marriage agreement, and that they should mutually assume the marriage status. This is not the case in the present proceeding. There are many cases bearing upon this point, and it would be impossible to make a complete brief of them, but the following are some of the best cases. Myatt v. Myatt, Admx., et al., 44 Ill. 473; Port v. Port, 70 Ill. 484; Hebblethwaite v. Hepworth, 98 Ill. 126; Cartwright v. McGown, 121 Ill. 399; Laurence v. Laurence, 164 Ill. 367; Peck v. Peck, 12 R. I. 485; Arnold v. Chesebrough, 58 Fed. Rep. 833; Commonwealth v. Stumpf, 53 Pa. St. 132; Yardley's Estate, 75 Pa. St. 207; Hunt's Appeal, 86 Pa. St. 294; Appeal of Grim., 131 Pa. St. 202; Hantz v. Sealy, 6 Binn. (Pa.) 405; White v. White, 105 Mass. 325; Letters v. Cady, 10 Cal. 533; Sharon v. Sharon, 75 Cal. 1.

WILLIAM A. DOYLE and JAMES D. ANDREWS, attorneys for appellee.

Where parties competent to contract have agreed to marry at some future time, if they have copula, which is lawful only in the married state, in the absence of any evidence to the contrary, they will be presumed to have become actually married by taking each other for husband and wife, and to have changed their future promises of marriage to one of present marriage. In such case copula will be presumed to have been allowed on the faith of the marriage promise, and that the parties at the time of such copula accepted each other as man and wife. Cartwright v. McGown, 121 Ill. 399.

The facts of this case must be distinguished from cases of seduction or sexual intercourse followed by a

promise of marriage. In such case the intercourse in its inception is illicit, and is known to be such. Id.

The presumption of marriage from cohabitation apparently matrimonial, is one of the strongest presumptions known to the law. The law presumes the moral and not immoral; marriage and not concubinage; where there is enough to create a foundation for the presumption of marriage, it can be repelled only by the most cogent and satisfactory evidence. Hynes v. McDermott, 91 N. Y. 459.

The agreement to keep marriage secret does not invalidate it, neither necessarily involves in doubt the proof of the existence of the marriage. 1 Bishop on Mar. & Div., Sec. 252; Carey v. Hulett (1896), 69 N. W. Rep. (Minn.) 31.

For circumstances which have weight in showing marriage state, see Laurence v. Laurence, 164 Ill. 374.

In cases where no ceremony has taken place, how is marriage to be proven? Manifestly by a line of conduct to be characterized by cohabitation and connubial constancy. From such a course of conduct the court will infer the consent which is spoken of as constituting the contract of marriage. Laurence v. Laurence, 164 Ill. 374.

Whatever may be the rule governing other contracts, the contract of marriage is *jure gentinum*, the consent and the consummation of marriage status are all that is required by natural or public law. It is necessary to a valid contract that both parties should consent to the marriage agreement and assume the marriage state. Laurence v. Laurence, 164 Ill. 371.

All the courts agree that this intention can be shown by a contract *de presenti*, or by a line of conduct showing that intention. Our court says it is impossible to fix a standard by which the evidence of marriage in every case should be determined, each case depends upon its

own facts and attending circumstances. How the conduct and bearing of the parties are regarded by their friends and relatives and by those with whom they associate, introducing each other as husband and wife, these are circumstances of more or less weight, as is the length of time the parties have lived together and the like. Cartwright v. McGown, 121 Ill. 399.

. MR. JUSTICE SEARS DELIVERED THE OPINION OF THE COURT.

Appellee filed her bill in the Circuit Court of Cook County, alleging that she was the wife of appellant, and praying that a separate maintenance be decreed her. Appellant answered, denying the allegation that he was the husband of appellee. Replication was filed to answer, a hearing was had, evidence heard, and a decree entered granting appellee the relief prayed. From that decree this appeal is prosecuted.

It appears from the evidence that no ceremonial marriage was ever performed between appellant and appellee, but it is claimed by appellee that a so-called common law marriage was contracted between them some time in the year 1862. The only question presented is as to whether such a contract was made. The evidence covering the actions of the litigants during so many years, from 1862 to the filing of the bill, is necessarily voluminous, but in order to present clearly the questions of fact and law which here arise, and which are of such grave consequence, it will be necessary to briefly consider the substance of the testimony.

As to the prior relations of the parties, the testimony of the litigants, the only witnesses to the occurrences preceding the making of the alleged contract, is substantially as follows:

Appellee fixes the beginning of acquaintanceship with appellant as in the year 1858, at the Richmond

House, Chicago, where appellant was a barkeeper and appellee a seamstress and nurse; states in substance that in 1861 both removed to the Sherman House, where each was employed in the same capacity as before; acquaintanceship had, up to removal from Richmond House and until 1862, been merely casual and not intimate; after removal to Sherman House appellant called on appellee at times; they went at times to theatre; met sometimes once a week, sometimes daily; had some words about another man who had once called upon appellee; that appellant said either that man or he (appellant) "would be coming here; that he (appellant) had a sister to educate, and that he was not in a hurry, he did not see why appellee should be;" that appellant gave appellee a ring; that there was no talk about it, but she considered that she was engaged; that nothing was said as to getting married; that in 1862 appellee was more than twenty-five years of age. Appellant testified as to what occurred previous to the time of the alleged contract, as follows: That while employed at the Richmond House he made no particular acquaintance with appellee; never went to her room there, and that first acquaintance began after removal to Sherman House, where both were employed, and sat at the same table in dining room; that he never spoke to appellee about another man who called upon her; never spoke of educating his sister; never gave her any ring; that at Sherman House he was in the habit of taking whiskey to her from the barroom, which she said she wished as a medicine; that he carried it to a back stairway leading to saloon, where she would meet him; that this continued for several months. This is the substance of all the evidence as to what preceded the time of the alleged contract. The testimony of the two as to the events which are claimed to have constituted a contract of marriage, is as follows:

Appellee testified: "Well, what took place there was that he came into the room one night, and he insisted on staying there, and I told him he could not stay there, but he said he would not leave the room that night. I said he must leave the room. He said he would not. I told him he would have to wait until we were married, and he lifted up his hands and he said that we were man and wife now, 'so help me God'—'We were man and wife.'"

Q. "Well, what followed this incident?"

A. "Well, he stayed there all night then."

Q. "Did you occupy the same bed?"

A. "The same bed."

The court asked, at a later time in the trial: "Mrs. McKenna, in 1862 or 1863, when you say Mr. McKenna come to your room one night, when you speak of your being married, or being husband and wife, state just what he said at that time?"

Answer: "He said that he would not leave the room, and I said he could not stay there. He said he would. I said he could not stay there, and he said, 'Well, we are as much man and wife now. I take you as man and wife, so before God and man,' and he lifted his hands. 'Well,' I said, 'if he was to stay in that manner, certainly I would let him stay.'"

Appellant testified: "They closed up the stairway (where he had been in the habit of bringing whiskey for appellee); she asked me once again for the whiskey, and asked me to bring it to her room. There was no other place that I could meet her or see her to bring it to her and I came up, and by that time the children would be asleep; the two children (for whom she was nurse), and she slept in the same room. I went there with a pint flask of whiskey in my pocket at 10 o'clock. I went there about that time and she opened the door and I went in. She told me to speak low. The chil-

dren were asleep; there was no gas lit, no light in the room, and I had her whiskey, and she was—had on a sort of a wrap, and we got fooling, and I took hold of her, and she thanked me for the whiskey and kissed me, and as we went by the door, the bed sat on the side, and I leaned her over on the bed and laid on the bed for a few minutes, and we got up and took off our clothes and went to bed.

A. "She said, 'Let me get up and take off the rest of my clothes.' "

That was about all.

Q. "Was there anything said there about that time in relation to any marriage?"

A. "Lord bless you, no, not a word."

Q. "How old were you at that time?"

A. "I must have been about eighteen or nineteen years old."

Q. "How long did you stay there?"

A. "An hour and a half or two hours, and got up and left and went to my room. That was the first time in my life I was ever in a bedroom with her. It was in June, July or August."

As to occurrences immediately following the time of the alleged contract and down to the time of the great fire in 1871, the testimony of the two is in substance as follows:

Appellee says, that subsequent to the conversation in her room at the Sherman House, appellant visited her every day and every night almost when he had a chance; they sometimes occupied same room at night; then in November following the conversation (which was in June, July or August), her employers went to New York to open another hotel; appellee was taken sick during the packing up work, and had a miscarriage. Appellant had her meals sent up to her, and provided attendance, etc.; there is no intimation,

however, in her testimony, that in his thus providing for her wants during this period of one or two days, there was any recognition of her as his wife. Appellant then took her to a friend of appellee's on Monroe street; was there only a few days; then went to Tremont House to work for Mrs. Gage; also worked for a year in the family of Mrs. Drake; then left and went to board "with a lady friend of mine;" during all this time appellant met her frequently; gave her means to care for her while boarding; he remained at Sherman House till the great fire; while working for a Mrs. Mix appellee was again pregnant and left her place, went to room procured by appellant, and gave birth to a child which was born dead; appellant was present at birth; then went back to work for Mrs. Drake; another child, which did not live, was born in May before the fire of 1871; was living in a flat from November until the June before the fire; appellee rented the flat, and appellant paid the rent, expenses, etc.; then went to Wabash avenue to board, and appellant paid for board.

Q. "When was the first time that you told anybody that you had been married to Mr. McKenna?"

A. "The time that we went to housekeeping on West Madison street."

Q. "After the fire?"

A. "Before the fire."

Q. "What year was that?"

A. "I could not tell you whether it was in 1864 or 1865."

Q. "It was about four or five years after that happened?"

A. "It might be three or four. It might be four years. I could not say exactly."

Q. "Up to that time, four or five years after that, you were known as a single woman, were you?"

A. "Yes, sir."

Q. "When did you and Mr. McKenna first set up in housekeeping?"

A. "I can't say whether it was in 1863, 1864, or 1865, I can't say the exact date; before the fire; set up housekeeping on West Madison street."

Q. "How long did you keep house with him after he started up?"

A. "I think it was in September, when I kept house until April; in April I went on Wabash avenue to board; I boarded there until the time of the fire. I couldn't give the exact date of when I went on Wabash avenue to board; it was in '64, '65, '66, may be it was later than that. It was a little while before the fire, because I boarded there at the time of the fire."

Q. "From that time until the fire you and Mr. McKenna didn't live together?"

A. "No, we didn't live together. We saw each other frequently."

Q. "Did Mr. McKenna say anything to you with reference to making the marriage public immediately after?"

A. "That he got a home; when he was well able to get a home, then it would be all public."

The testimony of appellant as to the occurrences of this period of nine years from the time of the alleged contract until the great fire, is substantially as follows:

Q. "Where did you next meet her? (after the night of the alleged contract.)"

A. "I made an arrangement with her, and met her on the corner, and went to a house on the corner of Madison street and 5th avenue."

Q. "How long after this did she leave the hotel, after this evening that you were with her?"

A. "I think she left within a year, anyway. She went to live over a saloon on Clark street. I remained in the Sherman; I stayed until the fire burned it down."

Q. "Now, from that time until the fire you may state whether or not this complainant here ever came to the Sherman house again?"

A. "Never."

"Later she told me that she was in the family way, and I got her a place with a washer-woman of mine to care for her; * * * then she went to some home, St. Joseph's Home, or some home—I never knew the place except through her. * * * She wrote to me that if I wanted to see her to address her in my name; that she had taken my name on account of friends discovering what took place, and I addressed letters in my name in order to shield her; this was in 1863 or 1864; some time after she again told me she was in an interesting way, and I got her a place on West Madison street. I think she rented apartments, and I went there and stayed nights with her till three or four months before she would be likely to be ill, then I got a midwife, and I stayed at the hotel; went back again to the Sherman House. Never said anything to anybody about my relations with appellee."

No other witness save the two litigants testified to any occurrence prior to the fire in 1871.

Appellee testified that after the fire she lived with appellant. "I seen him about three or four days after the fire.

"I then went to live on the west side. I kept house for myself and Mr. McKenna when I went to live there. I kept house right along until 1876, when I broke up housekeeping and went to board, and after September, 1876, I went back again to keeping house in the Van Buren block. Mr. McKenna and I didn't live together from the spring of 1876, until September, but he came up there every other day or every day. Every other day and Sundays to see me. In September I went back to 49 Van Buren, the same block that I had be-

fore, and stayed there until February, I think, the next year. Mr. McKenna was at the hotel, and he was there a part of the time. He took his meals at the hotel, but he would sleep over here. He had a room here, and he would come over to the house and sleep with me. In February I went up to Mr. Hughes. He broke up housekeeping then, and I went up to Mr. Hughes and stayed there for a little time. I only stayed there about three or four weeks; then I went to Mrs. McDonald's; I stayed there until June; then I had no more money, and he would not give me any more money, and I went up to St. Joseph's Home. I expect Mr. McKenna was at the hotel during this time; I didn't live with him during that time; I stayed a year and a half at the home. After I left the home I came to Mrs. McDonald's. I was there about two months, I believe.

"Mr. McKenna wanted I should take up house-keeping again. After that I went to the Van Buren block and got two rooms from a lady friend of mine, and stayed there until there was a flat vacant, and I took it again. I stayed there one year, and he came there every day most. At that time Mr. McKenna was at the Grand Pacific."

Q. "Where were you living just before you went to Michigan avenue?"

A. "I lived on 29th street. I had been there going on two years."

Q. "During those two years you had not been living with Mr. McKenna, had you?"

A. "No, he came there with the child, and after he came there and visited there every day and every evening after he brought the child to me. He took the child away in January (1890), and I went on the first of April (to the Michigan avenue house)."

Appellant testified to the occurrences between the

McKenna v. McKenna.

year of 1871 and the building of his house on Michigan avenue in 1890, substantially as follows:

"After the great fire, I had no place to live, and it was impossible to get a furnished room anywhere, and I slept in a blacksmith shop for three nights. I heard of a cottage that was for sale on Van Buren street. The furniture was for sale with a year's lease. I went to see that, and could get the lease by buying the furniture, paying $400 for the furniture. I bought the furniture and secured the lease—I then found this woman—I didn't know where she was at that time, I found her and asked her to come there and take care of the place, told her I had nowhere to sleep, could not get any furnished rooms, and she could stay there as housekeeper.

"Stayed in that cottage I think a year or thereabouts, and then it was moved off the lot. When the cottage was moved away we moved down further east on Van Buren street, took a flat. We must have gone there in 1873 or 1874, and how long we were there I can not tell you, probably a year or probably more or probably less. I can not tell."

Q. "Well, how much of your time did you spend there?"

A. "I would go there at night about half past 12 or 1 o'clock, and I would stay there until about half past 8 or a quarter to 9 in the morning. I would leave there and go back to my business and get breakfast and start in to work."

Q. "Where did you take your meals?"

A. "Always at the Pacific Hotel."

Q. "Now, where did you go after you left that place? Where did she go to?"

A. "Well, I got my room then in the hotel, and she went with some friends of hers; I think it was

McDonald. I would go once a week, Sunday afternoon, and sometimes some afternoon in the week."

Q. "And when did you next rent rooms for her?"

A. "I think there came along some conventions in Chicago one year, a great many, and we had to give up our rooms in the hotel, and I went back again to Van Buren street. I stayed there probably a year or two."

Q. "What time of the day during that time did you go there, or night?"

A. "The same time, year in and year out. From half past 12 or 1 at night, and leave again in the morning at a quarter to 9 or 9 o'clock. I took my meals at the Grand Pacific Hotel. I couldn't tell what year; that was along in the '70's anyway; it must have been 1874, probably. I know there was a time there that I hadn't seen or heard anything of the woman for about two years and a half or three years, and I met her on Adams street. Julia came along; that was the first I had heard or seen of her for two and a half or three years, and I shook hands with her and was glad to see her, and she looked bad, and I felt very sorry for her, and I asked her how she had been getting along and what she was doing, etc., and she told me that she had just come trying to get a place with Mrs. Drake; I asked her what Mrs. Drake said to her. She said Mrs. Drake questioned her about what she had been doing and where she had been living, and she told Mrs. Drake that she had been married, and she said she had married Jim Jones, that was a hackman here, and she asked me for money, and I gave her every cent that I had, which was sixty, eighty or one hundred dollars. That was before I went to the Centennial; it must have been 1874 or 1878 anyway. In 1876 she had rooms on the west side. I would go once a week or probably oftener; probaby two or three times when I had nothing to do in bad weather, couldn't stay out doors, and

I would go over there then.   My room in the hotel was cold and over there she had a stove and a fire, and I could stay there and smoke for an hour and go back to business again.   I guess I was giving her money.   I was always liberal with her; always generous.''

Q.   "She didn't go to the Centennial with you?"

A.   "No, sir."

Q.   "Where did you spend your nights after you quit work during that time?"

A.   "In my room in the hotel."

Q.   "Now, do you know where she went to after she left that place?"

A.   "No, indeed, I couldn't keep track of her.  She seemed to make acquaintances and move around and get friends and go in among her own acquaintances and people, and I would go to her room and go to see her, and I never had any acquaintance with them, never had any social acquaintance; didn't know them at all.   The woman never mixed with my acquaintances or with my friends.   I never took the woman anywhere; never went to a picnic with her, never went to a church with her, never went to a circus with her.''

Q.   "What time was it when you went in the Van Buren street flats?"

A.   "When they moved the first cottage off, 1873. The fire occurred in 1871, that was the year when I bought the furniture and got a year's lease on that property.   We stayed there a year and then the cottage was moved off.   It was 1872 or 1873 when we went into the Van Buren street block."

Q.   "When did she leave there finally?"

A.   "I can not give you the date, I guess she left there in '80 some time."

Q.   "Do you know where she went to when she left there in 1880?"

A.   "No, I do not know.   She went to somebody

named Spain, she went to somebody named McDonald, and she went to this Mrs. Gallagher, and this is all I can think of."

Q.   "Now what times and—did you go with her to any of these people and rent rooms for her?"

A.   "Never, sir, never."

Q.   "Now, after 1881, where did you then go in 1881?"

A.   "I think she went to Mrs. Cullings."

Q.   "Who took her there?"

A.   "Herself, I didn't know the people. I never knew them except through her. She must have been there two years and a half, probably two years. Two years and a half or three years. The first year I don't believe I was ever in the house. She was there a year before I ever was in the house. I never went there until I got the child." (The child adopted by appellant.)

In 1890 appellant, who was then living in the house which he had built upon Michigan avenue, took appellee into that house, as he claims, as housekeeper, and as she claims, as his wife. The testimony of the various people who occupied the house with them is conflicting. It appears, however, that she was called "Mrs. McKenna;" that the adopted child called her "mamma." Some witnesses state that they occupied a room together; others (including appellant) deny this. But it is clear that he did not present her among neighbors and acquaintances distinctly as his wife. There is throughout the years spent there, from 1890 to 1894, an uncertainty as to the position which she occupied in relation to the appellant. In 1894 he compelled her to leave the Michigan avenue house, and there the relationship ends, except as to litigation. During the years from 1871 to 1890 there is evidence that appellant paid rent at various times for appellee;

that together they rented a drawer in a safety deposit vault; that they stood together as godfather and godmother at the christening of a neighbor's child, and that appellant attended to the burial of the children born to appellee. There is, however, throughout the entire evidence—which is given in the record in anything but a clear manner—a lack of any reputation of marriage, except the most desultory and divided, and lack of any continued relationship between the parties, except such as bears the stamp of being clandestine. Appellant held, mortgaged, and dealt in real estate as a bachelor. In 1894 another and former bill in chancery, similar to the one here, was filed by appellee in the Circuit Court. A settlement was arranged between the parties, and an agreement signed, by which the marriage relationship was disavowed by appellee, and the bill was by consent dismissed for want of equity. The regularity and effect of this proceeding is now attacked by appellee. If a marriage were here established, it is doubtful if those proceedings would avail the appellant. But from the view we take of the evidence, as bearing upon the establishment of any marriage, the question of the former suit and its settlement becomes unimportant.

It is settled that under the common law here applying, marriage is such a contract as may be entered into without ceremony or solemnization of any sort, and all that is necessary thereto is a distinct agreement of the parties, followed by an assumption of the marriage status. Port v. Port, 70 Ill. 484.

It is very strenuously urged by counsel for appellee that in determining whether such a contract had been entered into by appellant and appellee, the court should apply the doctrine of presumption, as such presumption might be found to arise from the subsequent conduct of the parties. It is true that in the decision of

cases involving common law marriages, there has grown up a certain application of the theory of presumption as to the existence of a contract of marriage. In a large number of cases it has been held that, where direct evidence of any contract of marriage was wanting, as by reason of the supposed parties to the contract not being living or able to testify, and there being no other witness thereof, the fact that the conduct of the parties was consistent with the existence of a marriage relation between them, and from the standpoint of regard for morality and law, inconsistent with an absence of such relation, then from such conduct there would arise a presumption that at some time unknown and in some manner undisclosed, a contract of marriage had been entered into. It is the presumption of the law in favor of morality as against immorality, and of legality as against illegality. It would seem clear that this presumption is the outgrowth, not only of this favoring of the right as against the wrong in construction of conduct, but as well of the exigency of the cases, wherein it has been applied, in that all direct proof of what contract was entered into was wanting. It is mainly, if not exclusively, in cases involving questions of property rights or legitimacy, after death of the parties to the marriage sought to be established, that this theory of presumption from course of conduct is found to have been applied.

If a contract be proved by direct evidence, the theory of presumption as to any other or different contract can have no place; and if the entire transaction between the parties is exposed by direct evidence, whether it amounts to a contract of marriage or not, the theory of presumption is alike inapplicable. In the case under consideration *all* the transactions of the parties in their mutual relationship are proved. The parties are living and were witnesses upon the trial.

McKenna v. McKenna.

No presumption can arise from their conduct as to any contract having ever been made, other than the alleged contract which appellee says was made in the Sherman House upon the stated evening in 1862. No other contract than that is claimed to have been made. The subsequent conduct of the parties can not, therefore, be said to apply otherwise than as corroborative of the one or the other of the two witnesses to the specific events which are upon the one side claimed and upon the other denied, as constituting a contract of marriage.

We have, then, to determine from the evidence whether there has been established such consent on the part of each to enter upon the marriage relationship as would be necessary to bind each; and whether such consent, if any there were, was followed by an assumption of the marriage status.

In seeking the rules of law here governing, we need not look beyond the decisions of our own State, for the questions presented have arisen and been thoroughly considered in those decisions.

In Port v. Port, 70 Ill. 484, the court say: "We are inclined to the opinion * * * that a marriage without observing the statutory regulation, if made according to the common law, will still be a valid marriage, and that, by the common law, if the contract be made *per verba de presenti*, it is sufficient evidence of a marriage; or, if it be made *per verba de futuro cum copula*, the *copula* is presumed to have been allowed on the faith of the marriage promise, and that the parties, at the time of the *copula*, accepted each other as man and wife. * * * This is, however, merely a rule of evidence, and it is always competent in such cases to show by proof that the fact was otherwise." 1 Bish. 259; Myatt v. Myatt, 44 Ill. 473; Conant v. Griffin, 48 Id. 410. The rule is well illustrated by the language of

Lord Campbell in The King v. Mills, 10 Clark and
Finn, 534, 782: "If the woman in surrendering her
person is conscious that she is committing an act of
fornication instead of consummating her marriage, the
*copula* can not be connected with any previous promise
that has been made, and marriage is not thereby con-
stituted." Upon this principle, it was held in Beck-
ing's Appeal, 2 Brewster, 202: "A man may live with
his kept mistress in such a way as to create a kind of
repute of marriage among some persons; may, in order
to gratify her, hold himself out to her acquaintances
as her husband; may be a constant visitor, and often
eat and sleep at her house; may recognize the fruit of
the connection as his children, and manifest affection
for them; and yet the evidence may fall far short of
that which ought to satisfy the mind that there was an
actual agreement to form the relation of husband and
wife."

In Hebblethwaite v. Hepworth, 98 Ill. 126, the court
say: "A contract of marriage in the future, even
when the parties may afterward cohabit, is not under-
stood to constitute marriage, unless where, at the time
of cohabitation, the parties accept each other as hus-
band and wife, and so conduct themselves, that that
relation is understood and acquiesced in by relatives and
other acquaintances."

In Cartwright v. McGown, 121 Ill. 388, the court
say: "A marriage is a civil contract, made in due
form, by which a man and woman agree to take each
other for husband and wife, during their joint lives,
unless it is annulled by law, and to discharge toward
each other the duties imposed by law upon such rela-
tion. Each must be capable of assenting, and must, in
fact, consent, to form this new relation.  *  *  *  When
the consent to marry is manifested by words *de presenti
a present assumption of the marriage status is necessary,*"

and quoting from Van Tuyl v. Van Tuyl, 57 Barb. 237, the court continue:    "On the other hand, it is not sufficient to agree to present cohabitation and a future regular marriage,—citing Duncan v. Duncan, 10 Ohio St. 182; Beverson v. Beverson, 47 Cal. 621; Fryer v. Fryer, Rich. Eq. 85; Bish. on Mar. & Div., sec. 262." And the court say further: "Courts can not marry parties by mere presumption, without their consent. In the absence of consent, the status of marriage is never created by any government. The law compels no one to assume the matrimonial status. Without assent, no statute or constitution can create this relation." Citing Dickerson v. Brown, 49 Miss. 373.

In Laurence v. Laurence, 164 Ill. 367, the court say: "It is necessary to a valid marriage that both parties should consent to the marriage agreement and assume the marriage status," and "The evidence falls short of establishing the necessary elements of a common law marriage,—that of consent and assumption of the marriage status."

Measuring the evidence by the rules announced in these cases, we are led to the conclusion that the facts here disclosed fall short of establishing that consent of each party to enter into the marriage relation and that assumption of the marriage status which are both essential to constitute a common law marriage.

As to whether the words testified to by appellee were spoken by appellant, the evidence is, aside from corroborating circumstances, equally balanced. Nor can we find in the surrounding circumstances any sufficient corroboration of appellee. The parties had not previously agreed to disregard and dispense with the forms which are held by the community at large, and especially by those of their faith, to be indispensable to the proper creation of the marriage status. They did not meet for the avowed purpose of entering into a

civil contract. The meeting was clandestine; the occasion of whatever talk was had was an attempt upon the part of appellant to induce appellee to permit unlawful intimacy. But even if it were regarded as sufficiently established that at the time in question each spoke the words attributed by appellee, it is at least doubtful if they could be held to have constituted an assent by each to then enter upon a binding contract of marriage. Appellee says that in reply to the alleged statement of appellant, she merely gave him permission to remain in her room and consented to the intimacy which followed,—saying in substance, that if his motives were as expressed by him, he might remain. There was from her no word of assent to a proposed marriage; nothing which could have precluded her from repudiating any obligation upon her part by reason of what she had said. Had it been sought, immediately after the night in question, to enforce the supposed contract upon appellee, it is difficult to perceive how she could have been held to be bound by reason of any assent expressed by her to a contract of marriage. If there was no contract binding upon appellee as well as upon appellant, then there was in law no contract at all. But if it were conceded that the words spoken were sufficient, if followed by conduct indicating assent to a contract, we go a step further and inquire,—did the subsequent conduct of the parties amount to an assumption of the marriage status?

It would seem that an agreement by words must, in order to constitute a valid contract of marriage, be followed by an assumption of the marriage status—and this whether the words be *de futuro*, when the marriage relationship must be assumed after the words have been followed by cohabitation. Hebblethwaite v. Hepworth, *supra*,

McKenna v. McKenna.

Or if the words be *de presenti*, when a present assumption of marriage relationship is essential. Cartwright v. McGown, *supra*.

Nor does mere clandestine sexual intimacy alone constitute such assumption of the marriage status. It means more than that, viz., the ostensible relationship, recognized by relatives and other acquaintances. Hebblethwaite v. Hepworth, *supra*.

There is no conflict of evidence as to the fact that neither immediately after the evening in question, nor for three or four years thereafter, did the parties assume any mutual relationship, which could be construed as a marriage relation. Neither then nor for some time after did appellee assume the name or position of a wife of appellant; and if later she did assume the name, and after an interval of years, seek to assume the position, such action can hardly be so related back as to constitute a mutual assumption of the marriage status based upon a contract made in the year 1862.

Appellee testified that for three or four years following the date of the supposed contract, she lived as a single woman. If it had been sought during any one of those years to establish by a decree of court the fact of a marriage between these parties, how could any court have then adjudicated that there had been a mutual consent followed by mutual assumption of the marriage status? And how can any later relation of the parties create any presumption of a later contract, not claimed by either to have been made, or how could it aid a presumption which could not have obtained in the first three or four years following the date of the alleged contract?

It is true that a concealment for a time of the fact of a marriage, made by civil contract only, does not of itself necessarily preclude the validity of the contract if there be good reason for, and express agreement of the

parties to, such concealment. But here the evidence
fails to establish any agreement which, recognizing an
existing and binding contract, undertook to keep it
concealed for any specific reason or for any particular
time.

There is no doubt that the appellee was seduced by
appellant, and it is altogether probable that he held out
to her the hope of a marriage at some time. It appears,
too, that for more than thirty years an unlawful in-
timacy was carried on between them; that at times
and places there was a reputation of marriage, but a
divided reputation; that during those years appellant
provided at most times for appellee's living expenses,
for her medical attendance, and for the burial of the
children born to them, and that now in her old age he
is inclined to make less provision for her than formerly,
or perhaps none at all. His conduct, as disclosed, is
cruel. His very failure to make appellee his wife is
cruelty of the most brutal type. But that does not
supply the elements necessary to a valid contract of
marriage, nor justify the court in attempting to adju-
dicate contrary to the facts as they exist. The facts of
the case are such as to naturally and forcibly enlist the
sympathy of a court with the appellee. But we can
not, either for the purpose of aiding the wronged or
punishing the wrongdoer, violate settled principles of
law, or adopt rules not recognized by authority which,
however they might serve the exigency of this case,
might as well work extreme injustice to innocent parties
through future application. Not infrequently there is
in issue in cases like the one here, the legitimacy of
the innocent children of a marriage contracted after the
transactions which are sought to be made the basis of a
so-called common law marriage. Strict adherence to
just and well established rules of law, irrespective of
the hardship of the case, is the duty of the courts.

If parties wish to disregard the wise and wholesome regulations of the community as to forms and ceremony of marriage, they have the right so to do, and to make their marriage a matter of simple civil contract only; but in attempting so to do, they must see to it that such proof of the transaction is preserved as will enable courts to discover a valid marriage contract, viz., a definite agreement on the part of each, followed by an assumption of the marriage status.

The decree is reversed.